UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                Plaintiff,

                                              Case No. 19-cv-935-pp

        v.

ROGERS BEHAVIORAL HEALTH,

                Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 38), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 47) AND DISMISSING CASE**

On June 27, 2019, the Equal Employment Opportunity Commission filed a lawsuit on behalf of Gerri Wilson-Clayton against Rogers Behavioral Health, alleging violations of the Americans with Disabilities Act. Dkt. No. 1 at 1. In the introductory paragraph of the complaint, the plaintiff framed its claim this way: "Rogers Behavioral Health ('Rogers') discriminated against Wilson-Clayton by rescinding an offer of employment on the basis of a medical examination and perceived disability." Id.

On January 14, 2021, the defendant filed a motion for summary judgment. Dkt. No. 38. The plaintiff filed its own motion for summary judgment the following day, January 15, 2021. Dkt. No. 47. The court will deny the plaintiff's motion, grant the defendant's and dismiss the case.

1

## I.      The Allegations in the Complaint

The complaint alleged that in late 2017, Wilson-Clayton applied for the position of "Intake Specialist" with the defendant. Dkt. No. 1 at ¶12. On December 11, 2017, the defendant made Wilson-Clayton a "conditional" offer of employment. Id. at ¶13. The complaint alleged that as part of the defendant's "pre-employment requirements," the defendant required Wilson-Clayton "to successfully pass a physical and drug screen." Id. at ¶15. Wilson-Clayton received a letter telling her that her "start date will be delayed or not occur if all portions of the post offer employment physical . . . are not completed before your scheduled orientation date." Id. The defendant gave her a tentative orientation date of January 8, 2018. Id. at ¶14.

The complaint alleged that on December 14, 2017, Wilson-Clayton went to Aurora Occupational Health Services, a third-party company, for the physical and the drug screen. Id. at ¶16. As part of the physical, Wilson-Clayton completed a "Medical History and Physical Examination" form. Id. at ¶17. On that form, she listed her prescribed medications, including Alprazolam (which, the plaintiff explained, is the generic term for Xanax, a benzodiazepine "frequently prescribed to treat anxiety and panic disorders."). Id. at ¶18 and n.1. The complaint alleged that Wilson-Clayton "also identified certain medical impairments" on the form. Id. at ¶19.

Although Aurora performed the physical, a different third-party company—Noble Diagnostics—administered the drug test. Id. at ¶20. The test came back positive for Alprazolam. Id. at ¶22. The complaint alleged that on

2

the first page of the form, the doctor from Aurora who had performed the physical indicated that she had reviewed the drug screen—administered by Noble—and had found Wilson-Clayton "medically acceptable for work of this type," although the doctor recommended that Wilson-Clayton have a measles-mumps-rubella (MMR) booster before starting work for the defendant. Id. at ¶21. The complaint did not explain whether Wilson-Clayton took the drug test before or after she had the physical. It did not explain how the information about the result of the drug screen made it from Noble to the doctor who conducted the physical. It alleged only that "[n]either Noble nor [the defendant] followed up with Wilson-Clayton to request that she provide additional information about her lawfully prescribed medication," id. at ¶23, and that "[the defendant], through Noble and Aurora, knew that Wilson-Clayton had a prescription for Alprazolam," id. at ¶25.

The complaint alleged that on January 2, 2018, a recruiter for the defendant contacted Wilson-Clayton by email to tell her that the defendant was rescinding the employment offer "due to unsuccessfully completing the pre-employment requirements." Id. at ¶24.

The plaintiff alleged that "[the defendant] discriminated against Wilson-Clayton when it rescinded her job offer based on her use of a legally prescribed medication, in violation of Title I of the ADA, 42 U.S.C. §§ 12112(a), (d)(2)(B), and (d)(3)(C)." Id. at ¶26. It asserted that "[the defendant's] rescission of Wilson-Clayton's job offer due to her use of a legally prescribed prescription medication constituted a failure to hire her because of actual or perceived

3

impairments for which she was taking the medication." Id. at ¶27. The plaintiff alleged that the defendant's actions were intentional and done with malice or reckless indifference to Wilson-Clayton's federally-protected rights. Id. at ¶¶29-30.

## II.   **Procedural History**

The plaintiff filed the complaint on June 27, 2019. Dkt. No. 1. The defendant did not file a motion to dismiss or other dispositive motion; it filed its answer on August 26, 2019, dkt. no. 8, and amended the answer on November 11, 2019, dkt. no. 15.

The parties were able to agree on a discovery and dispositive motions plan, dkt. no. 11, which the court adopted, setting the deadline for completing discovery as June 1, 2020 and the dispositive motion deadline for July 1, 2020, dkt. no. 12. After some back and forth, they were able to agree on a protective order. Dkt. No. 22. They were able to agree to an amendment of the scheduling order, extending the deadline for completing discovery to October 1, 2020 and for filing dispositive motions to November 1, 2020. Dkt. No. 25. As the court noted in a November 2020 order, however, the cooperation between the parties seemed to evaporate when the plaintiff sought additional time to take a Rule 30(b)(6) deposition of a representative from Aurora. Dkt. No. 37. The court resolved the parties' disputes by extending the discovery deadline to December 18, 2020 and the dispositive motions deadline to January 15, 2021. Id. at 9.

Both parties filed motions for summary judgment—the defendant on January 14, 2021, dkt. no. 38, and the plaintiff on January 15, 2021, dkt. no.

4

47. Procedurally, the motions are notable in one regard: the proposed findings of fact. The same day it filed its motion, the defendant filed ninety-seven proposed findings of fact. Dkt. No. 46. In response to the plaintiff's proposed findings, the defendant filed another ten proposed findings of fact, dkt. no. 550, for a total of 107.[1] The plaintiff filed with its motion 100 proposed findings of fact. Dkt. No. 49. In response to the defendant's filings, the plaintiff filed eighty-two additional proposed findings. Dkt. No. 58. This brought the plaintiff's total to 182 paragraphs of proposed facts.

Under Civil Local Rule 56(b)(1)(C)(ii) (E.D. Wis.), "a moving party may not file more than 150 separately numbered statements of fact." Technically, the plaintiff has filed more than the number of proposed facts it is permitted. Oddly, however, the plaintiff's "additional" proposed findings of fact include over forty of the same proposed facts, many times in the exact wording, as its initial proposed findings of fact. Many of the paragraphs listed in the plaintiff's additional proposed findings of fact differ from the first set of proposed findings only in their citations. Because of the considerable overlap, substantively the plaintiff has presented fewer than 150 unique statements of fact. Given that,

---

[1] The plaintiff's response to the defendant's proposed findings mistakenly listed paragraph numbers 98-101 twice. Dkt. No. 67 at 1-3. The first set of paragraphs labeled 98-101 responded to the identically-numbered paragraphs from the defendant's additional proposed findings of fact; the second set of paragraphs labeled 98-101 responded to the proposed findings of fact at paragraphs 102-105 of the defendant's additional proposed findings of fact (Dkt. No. 55). Although the numbering is confusing, the plaintiff has responded to all 107 of the defendant's proposed findings of fact.

the court concludes that the plaintiff was not required to seek the court's leave to exceed the number of permitted statements of fact. <u>See</u> Civil L.R. 56(b)(7).

### III. Facts

#### A. Background

The defendant describes itself as "a national health care facility which offers a range of outpatient care for adults, adolescents, and children, including treatment for depression and other mood disorders, mental health, addiction disorders, anxiety, and posttraumatic stress disorders." Dkt. No. 57 at ¶1. Amanda Isaacson was the Employee Health Coordinator for the defendant at the time of the events described in the complaint, and Gina Whipple was its Employee Health and Wellness Specialist. <u>Id.</u> at ¶17. Brian Kramer was the Vice President of Human Resources and oversaw the Employee Health and Wellness Department. <u>Id.</u> at ¶18. Jamie Hildreth was a member of the defendant's pre-employment team. <u>Id.</u> at ¶30.

#### B. Pre-Employment Procedure

Because it is a healthcare facility, some of the aspects of the defendant's hiring process are "regulated by the government, including the State of Wisconsin." <u>Id.</u> at ¶2. Wisconsin's "pre-hiring" requirements for health care facilities "require a candidate for employment to produce documentation demonstrating: (1) they are physically able to perform the job; (2) they are free and clear of communicable diseases; (3) they have mumps, measles and rubella (MMR) immunity or vaccination; (4) they have undergone tuberculosis screening; and (5) they have hepatitis B clearance (collectively the 'State

6

Packet').” Id. at ¶3. Before starting work with the defendant, a candidate must "pass a post-offer drug test overseen by an independent testing laboratory and verified by an independent Medical Review Officer;” the plaintiff asserts that nothing, including Wisconsin law, compels the defendant to require drug testing or to condition employment on a drug test. Id. at ¶4.

The defendant used third-party vendors for parts of the post-offer, pre-employment process. Id. at ¶8. It used Cielo, a third-party recruiting company, to help with recruitment and to "provide[] instructions to candidates concerning the pre-employment screening process after they received a conditional employment offer.” Id. at ¶9. The defendant used Aurora Healthcare "to conduct pre-employment physical exams, confirm state-mandated information and handle post-offer, pre-employment drug screens.” Id. at ¶8; Dkt. No. 54 at ¶25. Aurora contracted with "Quest and Noble Diagnostics” to do the drug screens. Dkt. No. 54 at ¶26. Aurora engaged Dr. Kevin Edwards at Noble Diagnostics, Inc. "to verify the pre-employment drug screen results and clear any positive drug test results.” Dkt. No. 57 at ¶11.

The defendant says that it does not know if an employment candidate has a medical condition or disability unless the candidate requires an accommodation. Dkt. No. 57 at ¶14. The plaintiff disputes this, arguing that Aurora gathers information about medical conditions on the defendant's behalf as part of the pre-employment physical. Id. The defendant also asserts that recruiting firm Cielo does not have access to drug screens or physical examination records for employment candidates or to information maintained

7

by the Employee Health and Wellness Department, which the plaintiff disputes. Id. at ¶15. The plaintiff says that Cielo employees received information from the defendant about Wilson-Clayton. Id.

Employee Health Coordinator Isaacson and Employee Health and Wellness Specialist Whipple "were responsible for maintaining any medical information obtained during the hiring process, including the State Packet materials and Noble Diagnostics test results verified by Dr. Kevin Edwards, in a secure and confidential manner consistent with state and federal laws." Dkt. No. 57 at ¶17.[2]

The parties do not dispute that the defendant does not control the drug screen process. Id. at ¶19. Noble Diagnostics (contracted by Aurora to conduct the drug screens) uses a "non-DOT,[3] 10-panel drug test" that tests both for illegal drugs and for what the defendant characterizes as "the most highly

---

[2] Here, and in other instances, the plaintiff "disputed" this proposed statement of fact by stating that it disputed that state or federal law required the defendant to perform a drug screen. Dkt. No. 57 at ¶17. Nowhere in the defendant's statements of proposed fact does it assert that state or federal law required it to perform drug screens.

[3] According to the web site www.workplacetesting.com, the Department of Transportation governs drug testing for employers in the trucking, pipeline, aviation and rail industries and a handful of others, while every other employer is a non-DOT employer. The site says that DOT employers have a legal obligation to conduct drug testing and there are strict regulations governing DOT testing procedures, personnel and the results of positive tests. https://www.workplacetesting.com/crucial-differences-between-dot-and-non-dot-drug-test-requirements/2/4667#:~:text=The%20major%20difference%20between%20DOT,the%20consequences%20of%20positive%20tests. There seems little question that a healthcare institution such as the defendant is a non-DOT employer. The plaintiff makes several references to the DOT drug testing standards in the pleadings; the court is at a loss to determine their relevance.

abused legal prescription drugs;" the plaintiff disputes the "most highly abused legal prescription drugs" characterization. Id. at ¶20. The test includes an initial test, a confirmation test and a process through which an independent Medical Review Officer ("MRO") verifies the test. Id. at ¶21. While the defendant does not dispute that "[t]he entity requesting a drug screen can determine what substances are tested for specifically," dkt. no. 54 at ¶27, it later disputed another proposed finding by stating that it "does not choose which drugs are included in the 10-panel drug screen," dkt. no. 54 at ¶34. The defendant's drug screen "tests for illegal drugs, including prescription drugs taken without a valid prescription." Id. at ¶39. The plaintiff insists that the defendant decides what drugs Aurora tests for and whether to use a 5- or 10-panel test. Dkt. No. 67 at 102.

The defendant says that when a candidate tests positive, the Medical Review Officer contacts that candidate "to determine the reason for the positive test;" the plaintiff asserts that in this case, Dr. Edwards (the MRO) did not contact Wilson-Clayton and that an MRO's "assistant employed through Noble's subcontractor i3 Screen" was the one who called her. Dkt. No. 57 at ¶22. The defendant says it has no part in choosing the MRO; the plaintiff says that the defendant's contract with Aurora "provides for the designation of an MRO." Dkt. No. 67 at ¶103. Regardless, the parties agree that if the candidate "provides a valid prescription for a drug on the 10-panel drug screen, the Medical Review Officer changes the positive result to a negative result and forwards the negative result to [the defendant]." Dkt. No. 57 at ¶24. The

defendant asserts that only the MRO could clear a positive drug screen and that if the MRO does not do so, the defendant considers the candidate to have failed the pre-employment process and rescinds the employment offer. Id. at ¶¶25-26. The plaintiff states that there is no "requirement" that the MRO be the only one who could clear a positive drug screen, asserting that the defendant has the ability to decide what substances to test for and that it has the authority to ask Noble to use different procedures for screening the results. Id. at ¶25. The plaintiff also makes the somewhat incomprehensible assertion that the defendant "determined that failure to clear a positive drug screen was that the 'assumption that [Wilson-Clayton] did not have a valid prescription for the drug that she tested positive for,'" and says that for Wilson-Clayton, "the part of the preemployment process she did not pass was 'the drug screen,' and that she did not pass the drug screen because she tested positive on the drug screen." Id. at ¶26.

C.    Wilson-Clayton

In May 2016, Wilson-Clayton obtained a bachelor's degree in psychology. Dkt. No. 54 at ¶6. She is a survivor of Hodgkin's lymphoma. Id. at 7. She also has been diagnosed with anxiety. Id. at ¶8. The plaintiff asserts that between September 30, 2013 and December 24, 2019, Clayton-Williams was prescribed Alprazolam for anxiety; the defendant argues that Clayton-Williams's doctor couldn't recall whether the prescription was active in December 2017. Id. at ¶9. The plaintiff says that Wilson-Clayton took Alprazolam "as needed under the supervision of Dr. Huma Asghar," while the defendant argues that Asghar did

not treat Wilson-Clayton in December 2017. Id. at ¶10. The parties agree, however, that Wilson-Clayton's doctor had no reason to believe that Wilson-Clayton had abused her prescription for Alprazolam. Id. at ¶12.

The parties agree that Wilson-Clayton's abilities to work, care for herself, perform manual tasks, stand or lift and learn, concentrate or communicate were not substantially limited during this time. Dkt. No. 57 at ¶¶89-93. Wilson-Clayton was diagnosed with cancer in 2002 but has been in remission since 2008. Id. at ¶94. As of December 2017, Wilson-Clayton's doctor, Dr. Asghar, had not provided her with any treatment for eating or dietary issues. Id. at ¶95. The plaintiff asserts that Wilson-Clayton was diagnosed with insomnia on October 5, 2017, which the defendant disputes as unsupported. Dkt. No. 65 at ¶4. The defendant also contends that Dr. Asghar did not know whether Wilson-Clayton had sleep issues in December 2017 (the time of the events described in the complaint), although the plaintiff asserts that Dr. Asghar knew that Wilson-Clayton was seeing a sleep specialist and had longstanding sleep issues. Dkt. No. 57 at ¶95. The parties agree that Dr. Asghar did not see Wilson-Clayton between November 2016 and November 2017, although the plaintiff argues that that Wilson-Clayton was nonetheless under Dr. Asghar's care during that period. Id. at ¶96.

D.    Wilson-Clayton's pre-employment process

On November 18, 2017, Wilson-Clayton applied for a position as an intake specialist at the defendant's location in Brown Deer, Wisconsin. Id. at ¶13. The parties agree that an intake specialist does not give medication to

11

patients, come into contact with prescription drugs or have access to prescription drugs. Id. at ¶¶15-16. The parties agree that, setting aside the defendant's pre-employment, post-offer requirements, Wilson-Clayton was qualified for the position. Id. at ¶18.

On December 7, an employee of the defendant interviewed Wilson-Clayton. Id. at ¶14; Dkt. No. 57 at ¶27. A few days later, on December 11, Cielo recruiter Sarah Menard made Wilson-Clayton a "conditional" offer for the intake specialist position, "subject to a number of pre-employment requirements." Dkt. No. 54 at ¶17; Dkt. No. 57 at ¶28. The next day (December 12, 2017), Jaime Hildreth, a member of the defendant's pre-employment team, sent Wilson-Clayton an email that contained an offer letter, a job description and a checklist of pre-employment requirements. Dkt. No. 54 at ¶19. The offer letter told Wilson-Clayton that her tentative start date was January 8, 2018. Id. at ¶20. Among the pre-employment requirements Hildreth's email listed were "completing an occupational health appointment, submitting to a background check, providing onboarding documents, completing an I9 form, reviewing and signing [the] offer letter, and providing professional references." Id. at ¶21.

The offer was contingent on Wilson-Clayton providing satisfactory references, passing a background check and "successfully completing all portions of the physical and drug screen." Id. at ¶22. Hildreth's email listed several occupational health clinics where Wilson-Clayton could go to have the occupational health appointment; one of those was "Aurora Oconomowoc." Id. at ¶23. Part of the occupational health appointment was the 10-panel drug

screen. Id. at ¶24. The email advised Wilson-Clayton that she had only forty-eight hours (until December 14, 2017) to schedule and complete the screening and that she should notify Hildreth when she had scheduled the appointment. Dkt. No. 57 at ¶30.

The following day—December 13, 2017—Hildreth emailed Wilson-Clayton to remind her to schedule the health screening and to again ask that Wilson-Clayton notify Hildreth of the date and time of the appointment. Id. at ¶31. The defendant says that Hildreth was reminding Wilson-Clayton to schedule the screening "at one of the clinics on the list;" the plaintiff disputes that the December 13, 2017 email "included any statement that the occupational health screening must be scheduled at one of the clinics on the list." Id. Wilson-Clayton responded by asking for the list of occupational health clinics, which Hildreth re-sent to Wilson-Clayton. Id. at ¶32. Hildreth made another reminder contact on December 14, 2017, although the parties dispute whether the reminder was only for the medical exam or for other pre-employment screening obligations. Id. at ¶33. Wilson-Clayton responded that she did not know when she had to complete the appointment. Id. at ¶34. Hildreth sent the occupational screening information again. Id. at ¶35.

On December 14, 2017, Wilson-Clayton went to Aurora-Oconomowoc for the occupational health appointment, which was conducted by a certified medical assistant. Dkt. No. 54 at ¶¶41, 42. At the appointment, Wilson-Clayton filled out a four-page "Medical History and Examination Form," which included a list of her medications. Dkt. No. 57 at ¶36. The plaintiff says that at the

13

appointment, Wilson-Clayton "disclosed that she had a prescription for Alprazolam 0.5 mg, specifically listing this prescription by name among her current medications," while the defendant asserts that although Wilson-Clayton disclosed on the Aurora form that she was taking Alprazolam, she did not say that she had a prescription for it. Dkt. No. 54 at ¶43. Aurora did not request any proof of prescription. Dkt. No. 57 at ¶37. Wilson-Clayton also indicated on the third page of the form that she did not have any work restrictions and did not need an accommodation for the job. Id. at ¶38.

The plaintiff provided the court with the four-page form. Dkt. No. 59-7 at 2. On Page 1, under the "Test results reviewed" section, someone has marked the boxes for blood tests, a vision test and "other," next to which someone wrote "drug screen." Id. At the bottom of the page, someone wrote, "Recommend MMR Booster due to mumps titer low."[4] Id. Page 2 of the form asked for "Current Medications *(include over-the-counter and prescription)*." Id. at 3. The plaintiff listed several medications, including "Alprazolam 0.5 mg." Id. On Page 3 of the form, the plaintiff marked the "No" boxes next to "Do you have any work restrictions?" and "Do you think you need any accommodations regarding this job?" Id. at 4.

As part of the appointment, an occupational health expert from Aurora "extracted" a list of Wilson-Clayton's medications from its "Epic medical records system." Dkt. No. 54 at ¶44. That list showed a prescription for Lorazepam,

---

[4] "A titer is a measurement of the amount or concentration of a substance in a solution. It usually refers to the amount of antibodies found in a person's blood." https://medlineplus.gov/ency/article/002328.htm.

which the plaintiff says is "similar Benzodiazepine used to treat anxiety;" the defendant disputes that that prescription was current and whether the record contains evidence to support the assertion that Lorazepam is a similar benzodiazepine to Alprazolam. Id. at ¶45.

On December 14, 2017, after the medical exam was completed and Wilson-Clayton's urine had been collected, "Aurora completed its portion of the Aurora Form, indicating on Page 1 that Wilson-Clayton was '[M]edically acceptable for work of this type.'" Dkt. No. 57 at ¶39. See also, Dkt. No. 54 at ¶47. The plaintiff claims that Aurora considered the Alprazolam in making this determination, while the defendant disputes that record evidence supports this. Dkt. No. 54 at ¶46. "For confidentiality reasons and pursuant to [the defendant's] policy," only Page 1 of the form was sent to the defendant. Dkt. No. 57 at ¶42.

As noted, during the December 14, 2017 occupational health screening, the plaintiff provided a urine sample for the drug screen. Dkt. No. 54 at ¶48. That same day, Aurora sent the Page 1 of the completed Medical History and Examination Form to the defendant. Dkt. No. 57 at ¶40. The defendant asserts that Page 1 of the form "mistakenly stated that Wilson-Clayton had completed the drug screen on December 14, 2017." Id. at ¶41. (It actually states that the drug test results were reviewed. Dkt. No. 59-7 at 2.) The defendant secured the documentation—presumably Page 1 of the form—confidentially in its Employee Health and Wellness Department. Id. at ¶41.

15

Meanwhile, Wilson-Clayton's urine sample was sent to a lab for testing. Id. at ¶45. Five days later, on December 19, 2017, Noble Diagnostics received the results, which showed that the urine was positive for benzodiazepines— "Alprazolam." Id. at ¶46. See also Dkt. No. 54 at at ¶¶50-51 (The drug screen came back positive for Alprazolam, though for no other substances, and "Quest" communicated that fact "to Noble Diagnostics computer system.") The parties agree that Alprazolam is one of the drugs included in the 10-panel drug screen. Id. at ¶47. Noble provided Dr. Kevin Edwards as the MRO; the parties agree that he did not try to contact Wilson-Clayton. Dkt. No. 54 at ¶¶52-53.

E.    Post-testing contacts with Wilson-Clayton

1.    *December 18, 2017 email*

The parties agree that on December 18, 2017, Jaime Hildreth emailed Wilson-Clayton to let her know that the remaining item to be completed was the results "from occupational health;" they agree that the email did not mention the drug screen. Id. at ¶70.

2.    *December 19, 2017 phone call*

The plaintiff asserts that on December 19, 2017, Aurora called Wilson-Clayton to recommend that she get a MMR booster. Id. at ¶71. The defendant disputes that Aurora was acting on its behalf and asserts that the source of this fact lacked personal knowledge. Id. The plaintiff says that there was no mention of any "concern" regarding the drug screen during this call, while the defendant says that the person who provided this testimony said only that

Wilson-Clayton was informed that her MMR titer was low and recommended that she get a booster. Id. at 72.

### 3. December 19, 2017 voicemail

The defendant says that the same day—December 19, 2017—Noble Diagnostics followed "standard protocol" and called Wilson-Clayton at (414) 562-2816, "which was the only contact information she had provided on the Forensic Drug Testing Custody and Control form, to confirm she had a valid prescription for Alprazolam." Dkt. No. 57 at ¶51. The plaintiff disagrees that Noble followed "standard protocol," claims that Aurora believed that Noble followed DOT regulations when it did not and disputes that Noble made the call. Id. The plaintiff says that Noble's phone log shows that on December 19[5] at 10:26 a.m., Isioma Manu, "a subcontractor with i3screen working for Noble Diagnostics based out of Denver, Colorado," made the call; the defendant does not dispute this clarification. Dkt. No. 54 at ¶54. The telephone number Manu called "was a landline used by several of [Wilson-Clayton's] family members, including her grandmother, mother, daughter, and brother." Dkt. No. 57 at ¶53. Noble Diagnostics had case notes for call: "DC1-LVM-]NNOG," which the parties explain is an acronym for "donor call 1, left voice mail message, no name on greeting." Id. at ¶54. The parties dispute whether, when leaving a voicemail, Noble would indicate that the call related to a positive drug screen; the plaintiff says it would not, while the defendant says that Dr. Edwards said

---

[5] The proposed finding lists a date of December 19, 2020. Dkt. No. 54 at ¶54. The court assumes that this is a typo and that the plaintiff meant to refer to December 19, 2017.

that the person leaving the voicemail would say that "it's regarding test results." Dkt. No. 54 at ¶56. The parties also disagree about what the "script" for such a call would have been. Id. at ¶¶57-58. One way or the other, Wilson-Clayton does not recall receiving any message from Noble on December 19, 2017. Id. at ¶59; Dkt. No. 57 at ¶52.

The parties debate Noble Diagnostic's policies, with a "DOT vs. non-DOT" distinction featuring in the debate. Dkt. No. 54 at ¶60. The plaintiff asserts that Noble's policy was to make only one call, within twenty-four hours of receiving the positive result, to allow the person to explain the positive result "before confirming the result of the drug screen as a non-contact positive." Id. The defendant says that Dr. Edwards testified that for non-DOT tests, Noble left only one voicemail if the voicemail was working, that he did not testify that the call was made within twenty-four hours of receiving the positive result and that he *did* testify that the result was sent out as a noncontact positive if Noble did not receive a call from a pre-employment donor within twenty-four hours of leaving a "successful" voicemail. Id. The parties agree that a "non-contact positive" means that the drug screen was positive and that the MRO had not had contact with the test subject to discuss the results, receive further documentation or update to change the results. Id. at ¶61.

At 2:40 p.m. on December 20, 2017, Dr. Edwards logged Wilson-Clayton's drug screen result as a non-contact positive. Id. at ¶68. He did so under Noble Diagnostics' standard protocol because twenty-four hours had passed with no response from Wilson-Clayton. Dkt. No. 57 at ¶55. He also sent

18

the result to the defendant's Employee Health Coordinator, Amanda Isaacson, and its Employee Health and Wellness Specialist, Gina Whipple. Dkt. No. 54 at ¶69.

### 4. *December 21, 2017 phone call*

The parties agree that on December 21, 2017, Gina Whipple was notified by Noble that Wilson-Clayton had tested positive for a prescription medication, "had not returned the MRO's call, and had been identified as 'non-contact positive.'" Dkt. No. 57 at ¶57. They agree that on that same date, Whipple emailed Isaacson and advised her of the non-contact positive, stating that she (Whipple) would notify Wilson-Clayton to get in touch with the MRO. Id. at ¶58. The parties agree that that same day, Whipple contacted Wilson-Clayton by telephone. Id. at ¶59; Dkt. No. 54 at ¶73. While the parties dispute exactly what Whipple said to Wilson-Clayton, there appears to be no dispute that Whipple said that the Medical Review Officer was trying to get in touch with Wilson-Clayton. Dkt. No. 54 at ¶74. They do not disagree that Whipple did not tell Wilson-Clayton that she was calling about a positive drug screen. Id. at ¶75. They dispute whether Whipple told Wilson-Clayton what information the MRO needed from her. Id. at ¶76.

Whipple testified at her August 17, 2020 deposition that she had had a phone conversation with Dr. Edwards, the MRO, who'd stated that he was trying to get in touch with Wilson-Clayton, that he was not getting a response and that he'd asked if Whipple would mind following up and calling Wilson-Clayton and asking her to contact him. Dkt. No. 59-43 at 4, Tr. Page 23, lines

19

10-24; Tr. Page 24, lines 1-2. Whipple testified that following this conversation with Dr. Edwards, she contacted Wilson-Clayton "and let her know that the MRO was disclosing he was unable to get in touch with her directly, and he needed her to follow up with him directly in reference to her drug screening test and what was obtained." Id. at 3, Tr. Page 21, lines 10-14. Whipple testified that she gave Wilson-Clayton the contact information for the MRO. Id. at lines 16-17. She testified that Wilson-Clayton had responded that Wilson-Clayton had not received "notification" from the MRO. Id. at lines 18-21. Whipple recalled that Wilson-Clayton had told Whipple that Wilson-Clayton "was going to follow up accordingly and immediately." Id. at 4, Tr. Page 22, lines 1-6. Whipple recalled Wilson-Clayton being "very adamant that she was going to follow up with the MRO directly," making Whipple think that Wilson-Clayton would do so. Id. at 4, Tr. Page 25, lines 2-5. Whipple testified that she told Wilson-Clayton only that the MRO needed Wilson-Clayton to call back "in regards to the specimen;" she could not remember if she told Wilson-Clayton it was about the urine drug screen specimen. Id. at 5, Tr. Page 45, lines 20-24. The parties agree that Whipple's phone call to Wilson-Clayton was an "additional step which [the defendant] does not always take when an employment candidate fails to clear their drug screen with the Medical Review Officer." Dkt. No. 57 at ¶64.

Wilson-Clayton testified at her February 18, 2020 deposition that between the time she was given the offer and the time she learned that the offer had been rescinded, she had no phone conversations with anyone. Dkt. No. 59-

1 at 31, Tr. Page 44, lines 2-7. In contrast, Whipple's phone records indicate that her phone call with Wilson-Clayton on December 21, 2017 lasted two minutes and fifty-seven seconds. Dkt. No. 57 at ¶66.

The same day (December 21, 2017), Whipple sent Amanda Isaacson an email summarizing the call with Wilson-Clayton and stating, "I just got off the phone with NEO candidate Gerri Wilson-Clayton and she was going to follow up with Noble immediately." Dkt. No. 57 at ¶63; Dkt. No. 40-12 at 4. The email went on to say that Wilson-Clayton had "apologized" and explained that she had not gotten notification from Noble; Whipple characterized Wilson-Clayton as "more than compliant and pleasant to speak with." Dkt. No. 40-12 at 4. Whipple concluded the message by saying that she would see whether they received anything by the next day; if not, she said she would "give onboarding heads up that if we do not receive proper documentation by next Thursday 4pm deadline," Wilson-Clayton would not be able to begin orientation. The parties agree that the defendant "typically" sets a deadline of 4:00 p.m. on the Thursday before the candidate's orientation date to complete the pre-employment screening. Dkt. No. 54 at ¶78. Isaacson testified that she did not know why Wilson-Clayton's deadline was set *two* Thursdays before her orientation date. Id. at ¶79.

The parties do not dispute that Wilson-Clayton never contacted the MRO. Dkt. No. 57 at ¶67.

F.    Rescission of the Job Offer

On December 29, 2017, Isaacson contacted Noble to find out the status of the pre-employment screening process and learned that Wilson-Clayton had not provided any additional materials and that the drug test remained positive with no proof of prescription. Dkt. No. 57 at ¶68. Isaacson also sent an email to Jaime Hildreth, indicating that Wilson-Clayton had had a positive drug screen and that Whipple had indicated that Wilson-Clayton had contacted the MRO on December 21 saying she would supply documentation, but that Isaacson had contacted Noble and that they had received no documentation, that the drug test remained positive and that the offer would have to be rescinded. Dkt. No. 54 at ¶83; Dkt. No. 57 at ¶69. On January 2, 2018, Sarah Menard—an employee with third-party recruitment firm Cielo, dkt. No. 57 at ¶72—sent Wilson-Clayton an email stating that the offer was being rescinded "due to unsuccessfully completing the pre-employment requirements." Dkt. No. 59-50 at 2.

Wilson-Clayton emailed Jaime Hildreth, indicating that Menard had told her that the offer was being rescinded and asking Hildreth to call her to discuss the reason why. Dkt. No. 50-34 at 2. Wilson-Clayton said, "I know I was suppose to get the MMR booster shot from my doctor and I have been calling her to see if they could do it for me. Due to the holidays I haven't been able to get in contact with her." Id.

On January 3, 2018, Hildreth contacted Taylor Blake, the defendant's talent acquisition coordinator, asking her to tell Sarah Menard to clarify why

the offer was being rescinded. Dkt. No. 54 at ¶91. Hildreth did not contact Wilson-Clayton herself to explain why the offer was being rescinded. Id. at ¶93. Nor did Taylor Blake contact Wilson-Clayton. Id. at ¶94.

Wilson-Clayton contacted someone named "Lisa" at Aurora to ask whether the issue was her MMR booster. Dkt. No. 54 at ¶88. She then responded to Menard's email, explaining that she had completed the background check, that she'd spoken with Lisa who mentioned that Wilson-Clayton needed an MMR booster and stated that she hoped "it was a misunderstanding." Id. at ¶89. Menard emailed Taylor Blake, indicating that Wilson-Clayton was confused about what was going on and thought, from talking to Lisa, that the only missing piece was the MMR shot. Id. at ¶95. At her August 5, 2020 deposition, counsel played a recorded conversation for Menard and asked if she remembered having it; Menard responded that it sounded familiar, but that she "wasn't allowed to provide information based on what my supervisors had told me, so I guess that I don't—I don't remember if anyone else spoke with [Wilson-Clayton], if anyone else told her anything." Dkt. No. 50-8 at 5, Tr. Page 76, lines 4-22.

The parties agree that if Wilson-Clayton had provided verification of a prescription for Alprazolam to the MRO, the result would have been changed from positive to negative and forwarded to the defendant. Dkt. No. 57 at ¶77; Dkt. No. 54 at ¶96.

The parties agree that after December 29, 2017, no employee of the defendant contacted Wilson-Clayton to tell her that the offer had been

rescinded due to a failure to pass a drug screen. Dkt. No. 54 at ¶99. Nor did

the defendant send Wilson-Clayton written notice that the offer was being

revoked due to a positive drug screen. Id. at ¶100.

G.    EEOC Charge, Lawsuit

On January 24, 2018, Wilson-Clayton filed a Charge of Discrimination

with the EEOC alleging a Title I violation under the ADA. Dkt. No. 57 at ¶78.

Wilson-Clayton alleged that the defendant had rescinded her job offer "after she

'had a medical history and physical examination.'" Id. The plaintiff then filed

this lawsuit, alleging that the defendant had discriminated against Wilson-

Clayton by rescinding her job offer based upon her use of legally prescribed

medication and that it chose not to hire Wilson-Clayton "'because of actual or

perceived impairments for which she was taking the medication.'" Id. at ¶79.

Between January 1, 2017 and July 1, 2019, 1,848 individuals underwent

occupational health screenings as candidates for employment by the

defendant. Id. at ¶83. The defendant says that seventy-three of these

individuals tested positive on drugs screens and their cases were reviewed by

the MRO. Id. at ¶84. The defendant says that of those seventy-three cases,

fifty-three provided valid prescriptions and were cleared by the MRO. Id. at

¶85. The defendant also argues that ten of those fifty-three cases involved

positive tests for benzodiazepines. Id. at ¶86. The defendant says that twenty of

the seventy-three cases led to rescinded offers and that Wilson-Clayton was the

only candidate who tested positive for a prescription drug and was not cleared

by the MRO. Id. at ¶¶87, 88. The plaintiff challenges the foundation of these

statements, disputing whether the defendant knows how many and what kinds of positive tests resulted in this period, which of the cases the MRO reviewed after positive tests and how those individuals proved they had prescriptions. Id. at ¶¶84-88.

## IV. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In determining whether summary judgment is appropriate, courts are to view the facts and draw reasonable inferences in the light most favorable to the non-moving party. _Scott v. Harris_, 550 U.S. 372, 378 . . . (2007). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 252 . . . (1986).

> To survive a defendant's summary judgment motion, a plaintiff must make a "showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." _Johnson v. Advoc. Health & Hosps. Corp._, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting _Celotex Corp. v. Catrett_, 477 U.S. 317, 322 . . . (1986)).

Parker v. Brooks Life Science, Inc., 39 F.4th 931, 936 (7th Cir. 2022).

## V. Analysis

### A. Applicable Law

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to job application procedures [and] hiring.'" Roberts v. City of Chi., 817 F.3d 561, 565 (7th Cir. 2016) (quoting 42 U.S.C. §12112(a)).

25

Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts as we answer the only question that matters: when looking at the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). [When the court is] evaluating this question in the context of [the defendant's] motion for summary judgment, [its] task is to look at the facts in the light most favorable to [the plaintiff] and determine whether [the defendant] is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 . . . (1986).

Brooks v. Avancez, 39 F.4th 424, 433 (7th Cir. 2022).

To prove a violation of § 12112(a), [the plaintiff] must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

Id.

Prior to August 2016, courts approached employment discrimination cases by analyzing whether a plaintiff could prove these elements by either a "direct" method or an "indirect" method. "Admissions of culpability and smoking-gun evidence were assigned to the 'direct' method . . ., while suspicious circumstances that might allow an inference of discrimination were assigned to the 'indirect' method." Ortiz, 834 F.3d at 763. In August 2016, however, the Seventh Circuit observed that "[t]he use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years," listing cases in which various members of that court had "disapproved both the multiple methods and the

search for mosaics." Id. at 764 (citations omitted). The court said, "The time has come to jettison these diversions and refocus analysis on the substantive legal issue." Id. The court stated that the relevant legal standard

> is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself— or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

Id. at 765. The Ortiz court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." Id.

The Ortiz court noted that "[t]he burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), sometimes is referred to as an 'indirect' means of proving employment discrimination." Id. at 766. It clarified that its decision did not concern McDonnell Douglas "or any other burden-shifting framework, no matter what it is called as a shorthand." Id. The court explained that its decision addressed only the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently;" it explained that "all evidence belongs in a single pile and must be evaluated as a whole," and found that conclusion consistent with McDonnell Douglas. Id.

The Seventh Circuit since has noted numerous times that the McDonnell Douglas burden-shifting framework "can be a helpful way to evaluate evidence

27

of discriminatory intent in employment discrimination claims." Brooks, 39

F.4th at 434.

> [The plaintiff] can make a prima facie case of discrimination by demonstrating that (1) she is disabled under the ADA . . .; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. . . . *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 853 (7th Cir. 2014) (ADA). If [the plaintiff] successfully establishes a prima facie case of discrimination using these steps, then [the defendant] must produce evidence demonstrating that it took the actions [the plaintiff] complains of based on legitimate, nondiscriminatory reasons. If successful, it falls to [the plaintiff] to demonstrate that [the defendant's] reason is pretextual—that is, an attempt to mask a discriminatory reason with a legitimate excuse. . . . *Hooper*, 804 F.3d at 853 (ADA).

Id.

    B.    The Parties' Arguments

        1.    *The Defendant's Motion*

The defendant alleges discovery has revealed that the complaint

mischaracterized what happened, and describes the allegations in the

complaint as "outrageous." Dkt. No. 39 at 1. The defendant argues that

although the complaint alleged that the defendant rescinded the employment

offer because Wilson-Clayton was using medication that had been legally

prescribed to her, knowing that she had a prescription and without asking her

for proof of that prescription, the discovery showed that the EEOC was aware

before it filed the lawsuit that the reason Wilson-Clayton failed the pre-

employment process was not because she was using a prescribed medication,

but because she never provided proof that she had a prescription for that

medication. Id. at 1-2. The defendant argues that had Wilson-Clayton provided

28

the defendant with a valid prescription, the job offer would not have been rescinded. Id. It also asserts that before the lawsuit was filed, it did not have access to or knowledge of Wilson-Clayton's medication information—including information about whether she suffered from a disability or information about why she was taking the Alprazolam. Id. at 2.

As for its legal analysis, although the defendant filed its summary judgment motion four and a half years after the Seventh Circuit put to rest the "direct/indirect method" distinction, the defendant says that a plaintiff may prove disability discrimination using either the direct or the indirect method of proof. Id. at 13 n.7. It asserts that the plaintiff "cannot proffer any evidence that would allow it to proceed under the direct method." Id. (citing Dickerson, 657 F.3d at 601). The defendant says that "this Court's analysis need only consider the indirect method." Id.

The defendant says that the plaintiff cannot establish a *prima facie* case of discrimination (and that it knew prior to filing the lawsuit that it could not do so). Id. at 13. As to the first prong of a *prima facie* case of discrimination, the defendant asserts that the plaintiff cannot prove that Wilson-Clayton was disabled, noting that neither her EEOC charge nor the plaintiff's complaint identify a disability. Id. at 13-14. The defendant assumes that the plaintiff believes that Wilson-Clayton's anxiety (which the defendant asserts that it learned, post-complaint, was the reason she was taking Alprazolam) is "her purported disability." Id. at 14. The defendant asserts that even if the plaintiff meant to argue that anxiety is Wilson-Clayton's disability, the anxiety did not

meet the ADA definition of a disability because the plaintiff has not presented evidence that the anxiety substantially limited any of Wilson-Clayton's major life activities. Id. at 14-17. The defendant also argues that the plaintiff has not presented evidence that the defendant perceived Wilson-Clayton as disabled. Id. at 17. The defendant says it is undisputed that the defendant did not learn of Wilson-Clayton's medical history—including the anxiety for which she was taking Alprazolam—until after the plaintiff filed this lawsuit. Id. at 18. While it knew that Wilson-Clayton had tested positive for Alprazolam, there is no evidence that the defendant knew *why* Wilson-Clayton was taking the medication. Id.

As to the second prong of a *prima facie* case, the defendant argues that the plaintiff has not presented proof that Wilson-Clayton was meeting the defendant's legitimate business expectation. Id. at 19. The defendant asserts that, at the very least, Wilson-Clayton was notified by Whipple that she needed to call the MRO. Id. She did not do so, and the defendant says that the offer was rescinded because doing so was part of the pre-employment screening process, a part Wilson-Clayton did not complete. Id.

The defendant asserts that the plaintiff has not presented proof of the fourth prong of a *prima facie* case: that the defendant treated similarly situated individuals more favorably than it treated Wilson-Clayton. Id. at 20. The defendant argues that the plaintiff has not identified at least one other candidate who tested positive on the 10-panel test, did not provide proof of a prescription for the drug for which he or she tested positive but nevertheless

30

was hired. Id. The defendant says that to the contrary, there is record evidence that for the period January 2017 through July 2018, every candidate who tested positive for a drug on the 10-panel drug screen and provided a valid prescription was hired. Id.

The defendant argues that even if the plaintiff could establish a *prima facie* case of discrimination, shifting the burden to the defendant, the defendant can prove that it had a legitimate, non-discriminatory reason for rescinding the job offer. Id. at 20. The defendant says that it refused to hire the plaintiff because she did not complete the pre-employment process by following up with the MRO (and providing proof that she was taking Alprazolam under a doctor's prescription). Id. at 21. The defendant anticipates that the plaintiff will argue that Wilson-Clayton was confused about the process; it points to record evidence that Whipple told Wilson-Clayton she needed to contact the MRO and that Wilson-Clayton stated that she understood and would do so. Id. at 22. It anticipates that the plaintiff will argue that Wilson-Clayton needed more time to demonstrate that she was taking the Alprazolam under a valid prescription; it asserts that this argument likely is based on the plaintiff's misplaced reliance on Department of Transportation regulations and notes that the record contains no evidence that Wilson-Clayton asked for more time or would have done anything differently if she'd had more time. Id. at 22-23. Finally, the defendant anticipates that the plaintiff will argue that the recruiting company—Cielo—should have known the details of Wilson-Clayton's failed drug test; it counters that due to confidentiality requirements, confidential information

31

such as testing positive for controlled substances could not be shared with third-party providers. Id. at 24.

The defendant asserts that there is no evidence that the reasons it has given for rescinding the employment offer were pretextual. Id. at 25. It says that its "entire team provided consistent testimony" about the pre-employment process, the reason for it, Wilson-Clayton's failure to follow it and the fact that the offer would not have been rescinded if she *had* followed it. Id. The defendant asserts that there is nothing in the record to demonstrate that the "real reason" that it rescinded the offer "was anything other than [Wilson-Clayton's] failure to complete the pre-employment screening process." Id. at 26. The defendant anticipates that the plaintiff will try to show pretext by claiming that the defendant knew Wilson-Clayton had a valid prescription; the defendant counters that it is undisputed that that while Wilson-Clayton gave *Aurora* her medical history and the list of medications she was taking, Aurora did not provide this information to the *defendant.* Id. The defendant argues that as of the date it filed its summary judgment motion, Wilson-Clayton still had provided no proof of a valid prescription. Id. at 26-27.

The defendant concludes by arguing that the plaintiff's "attack on [the defendant's] pre-employment screening process" must fail. Id. at 27. Observing that at the end of the complaint, the plaintiff had alleged that the defendant "'rescinded her job offer based upon the use of a legally prescribed medication' in violation of § 12112(d)(3)," the defendant argues that that statute is designed to "ensure that an employer's reasons for *withdrawing a conditional job offer*

32

are 'job-related and consistent with business necessity." <u>Id.</u> at 27-28 (citing 29 C.F.R. §1620.14(b)(3)). The defendant states that it doesn't withdraw conditional job offers because of a candidate's use of Alprazolam (or any other legally prescribed medication); it withdraws conditional job offers when a candidate fails to complete the pre-employment screening process. <u>Id.</u> at 28. And, the defendant argues, to prevail on a claim under §12112(d)(3)(C), the plaintiff must demonstrate that Wilson-Clayton was disabled; the defendant again asserts that Wilson-Clayton was not disabled. <u>Id.</u> at 29.

<b>2.</b> <i>The Plaintiff's Motion</i>

The plaintiff's brief in support of its motion—filed a day after the defendant filed its motion and brief—describes its claim this way: "Defendant . . . wrongfully discriminated against Gerri Wilson-Clayton in violation of the Americans with Disabilities Act when it revoked her conditional offer for employment after she tested positive for a prescription drug she had disclosed to [the defendant]." Dkt. No. 48 at 3. It says that it is entitled to summary judgment

> on its claims that [the defendant] unlawfully discriminated against Wilson-Clayton when it regarded her as disabled, erroneously believing she abused drugs, and rescinded her job offer on that basis, 42 U.S.C. 12112(a); when it subjected Wilson-Clayton to a pre-employment medical inquiry that was not related to Wilson-Clayton's ability to perform job related functions, 42 U.S.C. 12112(d)(2)(b); and when it used the results of an employment entrance examination in a manner inconsistent with the ADA, 42 U.S.C. 12112(d)(3)(C).

<u>Id.</u> at 2.

The plaintiff's primary brief in support of its motion does not use the words *prima facie* or reference McDonnell Douglas. It relies extensively on decisions from other districts and other circuits (although the Seventh Circuit has issued many employment discrimination decisions).

The plaintiff begins its legal arguments by asserting that "[c]ourts have not hesitated to grant affirmative summary judgment to motions on ADA liability involving improper medical exams." Id. at 7 (citations omitted). It then states that "[t]here is no genuine dispute that [the defendant] revoked Wilson-Clayton's conditional offer because [the defendant] wrongly perceived her to be [a] person with a drug abuse impairment." Id. at 8. The plaintiff says that the ADA includes in the definition of "disability" "being regarded as having an impairment," citing 42 U.S.C. § 12102(1)(C). Id. at 10. It maintains that Wilson-Clayton was "disabled" under the statute because the defendant "regarded her as disabled due to the abuse of drugs," and asserts that this fact is not in "material dispute." Id. The plaintiff claims that the defendant based its adverse employment action "on its erroneous belief that Wilson-Clayton abused drugs," and reiterates that Wilson-Clayton met the definition of being "disabled" under the ADA "because [the defendant] erroneously regarded her as having the impairment of drug abuse and rescinded her offer on that basis." Id.

The plaintiff goes on to argue that "drug addiction can be an impairment under the ADA." Id. 11 (citations omitted). It maintains that although a person who is illegally using drugs does not qualify as a person with a disability under the ADA, that is not true of a person who is erroneously regarded as engaging

34

in illegal drug use when she is not. Id. The plaintiff says that the ADA protects individuals who are erroneously regarded as being engaged in the illegal use of drugs. Id. at 12. It says that although Wilson-Clayton had a lawful prescription for the Alprazolam, the defendant "erroneously regarded her as engaging in the abuse of illegal use of drugs and rescinded her offer on that basis." Id. at 13. The plaintiff says, "[u]ltimately, it was the assumption that [Wilson-Clayton] abused drugs that led [the defendant] to rescind its offer," and asserts that this assumption was both factually wrong and legally impermissible. Id.

The plaintiff argues that whether the defendant acted in good faith or was unaware that Wilson-Clayton had a prescription "when it erroneously regarded her as disabled" is not relevant to whether the defendant unlawfully discriminated against her. Id. It maintains, however, that the defendant did not act in good faith, because the defendant knew "through its agent Aurora" that Wilson-Clayton had a prescription because Wilson-Clayton disclosed that she had one. Id. at 14. The plaintiff asserts that "[d]espite knowing that Wilson-Clayton had this prescription, [the defendant], through its agent, subjected Wilson-Clayton to a drug screen testing for the very substance she had disclosed." Id. The plaintiff argues that after "subjecting" Wilson-Clayton to this test, the defendant—through third parties Noble and i3screen and through its own employee Whipple—"left only a voicemail and a single ambiguous phone call, neither of which referenced the drug test or the need to provide a prescription." Id. The plaintiff says that the defendant "then decided to rescind Wilson-Clayton's offer a week earlier than its standard timeline for rescinding

35

employment offers," which, the plaintiff says, was "around the time of the winter holidays." Id.

The plaintiff argues that after learning that the offer was rescinded, Wilson-Clayton tried to contact employees of the defendant as well as Aurora to find out why the offer had been rescinded, but that the defendant "refused" to tell her the reason and "denied her a meaningful chance to correct any understanding." Id. at 15. The plaintiff says that "[b]y implementing a drug screen in the manner that it did, [the defendant] risked screening out an applicant whom it erroneously regarded as engaging in the illegal use of drugs," and that Wilson-Clayton was a "victim of this practice." Id.

Next the plaintiff argues that the defendant has admitted that Wilson-Clayton was qualified to perform the position of intake specialist. Id. It argues that there is no dispute that the defendant, "through Aurora," had medically cleared Wilson-Clayton to work. Id. It asserts that that medical clearance from Aurora "included consideration of the medications Wilson-Clayton disclosed, including Alprazolam." Id. The plaintiff reiterates that the sole reason the defendant rescinded the job offer was Wilson-Clayton's drug screen result. Id.

The plaintiff next asserts that the defendant denied Wilson-Clayton employment "because of information obtained during an impermissible medical examination." Id. The plaintiff says that this is a separate basis for granting summary judgment in its favor. Id. The plaintiff argues that although there are two provisions of the ADA that address pre-employment "exams"—§§12112(d)(2) and 12112(3)(3)—under either one, the defendant "had no job-

36

related reason to test for Alprazolam, Wilson-Clayton's prescription medication." Id. at 16. The plaintiff asserts that "[t]his overly broad medical exam testing for a disclosed prescription medication unrelated to the job resulted in Wilson-Clayton being denied hire." Id.

The plaintiff claims that a urine drug screen "was a medical exam as defined by the ADA," citing the factors laid out by the Seventh Circuit in Karraker v. Rent-A-Center, Inc., 411 F.3d 831, 835 (7th Cir. 2005). Id. at 14-15. It asserts that the defendant "cannot avoid liability by claiming that its urine test for a prescription medication Wilson-Clayton voluntarily disclosed is a test for illegal drugs rather than a medical exam under the ADA." Id. at 15 (citing cases, including Connolly v. First Personal Bank, 623 F. Supp. 2d 928, 931 (N.D. Ill. 2008)). The plaintiff argues that the defendant had the choice of what substances to test for, and that it chose "to test for both legal prescription medications and illicit drugs." Id. at 18. It reiterates that Wilson-Clayton had told Aurora that she had a prescription for Alprazolam. Id. at 18-19. The plaintiff reiterates that the defendant "was testing Wilson-Clayton for a legal medication." Id. at 19.

The plaintiff also argues that the defendant "cannot avoid liability by arguing that it had no knowledge that Wilson-Clayton disclosed the prescription drug they tested her for." Id. at 19. Citing Holiday v. City of Chattanooga, 206 F.3d 637, 645 (6th Cir. 2000), the plaintiff says that employers cannot escape their ADA obligations by contracting hiring and personnel functions to third parties. Id.

The plaintiff spends some time discussing whether the drug screen was a pre-employment or post-job offer medical exam, and concludes that it was a pre-employment exam that was permissible only if "the test relates to the job functions, which [the defendant] cannot show." Id. at 20-21. It argues that the defendant had no job-related reason to test for the prescription drug Alprazolam and that use of that drug had no relationship to the intake specialist job. Id. at 22. It asserts that even under the post-job offer medical exam requirements, the defendant violated the ADA because "it used the results of its medical exam without establishing business necessity or job relatedness for such use." Id. at 23. The plaintiff says, "The undisputed facts show that Wilson-Clayton is an individual with a disability who was screened out by selection criteria from the exam and that those criteria were not necessary or job-related," and that this violates 29 C.F.R. §1630.14(b)(3). Id. It says that the defendant "conditioned employment on successfully passing a 10-panel drug screen, which screened for both illegal drugs and lawful prescription medication," and that the defendant expected Wilson-Clayton to provide documentation to show that she had a prescription for the medication for which she tested positive. Id. at 24. It contends that the defendant "can offer no support for why this requirement is necessary or job-related for the position Wilson-Clayton sought." Id. It also argues that the defendant "cannot state why there is a business necessity to take only the minimal efforts it made to find out if Wilson-Clayton had a prescription," arguing that the defendant never communicated to Wilson-Clayton that it needed one. Id.

38

The plaintiff asserts that Aurora called Wilson-Clayton to tell her that her MMR titers were low and to recommend that she get a booster, but that it never instructed her to provide a prescription for Alprazolam or told her that there was a problem with the drug screen. Id. at 24-25. The plaintiff says that Wilson-Clayton "had no way of knowing that her job offer depended entirely upon her calling [the defendant] to explain her use of this prescribed medication." Id. at 25. It asserts that "[a] non-disabled person not prescribed a medication would not have faced these burdens and hurdles," and asserts that the "selection criteria" screened out Wilson-Clayton, "an individual with a disability, because of the medication that she took to treat that disability." Id.

C.    Discussion

    1.    *Section 12112(a) discrimination claim*

        a.    The plaintiff's "smoking gun" theory

In its opposition brief to the defendant's motion for summary judgment, the plaintiff—like the defendant—references the "direct/indirect method" distinction. Dkt. No. 56 at 13. It disputes the defendant's argument that the plaintiff must use "indirect" proof to prove that the defendant discriminated against Wilson-Clayton in violation of the ADA, asserting that its case "involves an admission of [the defendant's] improper motives and perception of why it revoked Wilson-Clayton's offer" and claiming that the defendant has admitted that it rescinded the offer because Wilson-Clayton failed the drug screen by testing positive for Alprazolam, "rather than any other failed pre-screening requirement." Id. The plaintiff insists that the defendant has admitted "that it

39

believed that an applicant who fails to pass the drug test for Alprazolam is a drug abuser." Id.

In a footnote, the plaintiff acknowledges the Seventh Circuit's decision in Ortiz and the appellate court's directive that lower courts must stop using the "direct/indirect method" distinction, but it claims that "[i]n this case, there is sufficient evidence to permit a reasonable factfinder to conclude that Wilson-Clayton's proscribed factor, her disability, caused the adverse action of rescinding her offer. The evidence that permits this conclusion is what the Dickerson [v. Bd. of Trustees of Comm. College Dist. No. 522, 657 F.3d 595 (7th Cir. 2011)] court described as 'direct' evidence." Id. at 13 n.5.

Giving the plaintiff the benefit of the doubt, the court assumes that the plaintiff is not suggesting that despite the Seventh Circuit's clear directive, this court should use the "direct/indirect method" analysis. As best the court can tell, this strange argument is the plaintiff's way of arguing that it need not rely on the McDonnell Douglas burden-shifting framework to prove discrimination because the defendant has admitted that it discriminated. The court disagrees.

Recall that to prove a violation of 42 U.S.C. §12112(a)—discrimination in hiring based on a disability—the plaintiff must show that (1) she is disabled; (2) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. As the court will discuss below, the plaintiff's theory as to Wilson-Clayton's disability shifts over the course of briefing, but for purposes of this argument, the plaintiff

40

claims that the disability for which the defendant discriminated against Wilson-Clayton was the defendant's erroneous perception that Wilson-Clayton abused drugs.

The parties do not dispute the second element—that setting aside the defendant's pre-employment requirements, Wilson-Clayton was otherwise qualified for the position of an intake specialist. Nor do the parties dispute the third element—that Wilson-Clayton suffered an adverse employment action (rescission of the conditional job offer). The court must determine whether there is "smoking gun" evidence (or a genuine dispute as to a material fact about such evidence) that would allow a reasonable trier of fact to conclude that Wilson-Clayton was disabled—per the plaintiff's argument, that she suffered the disability of being perceived by the plaintiff to have been a drug abuser—and that the rescission of the job offer was caused by that disability.

In its brief in opposition to the defendant's motion for summary judgment, the plaintiff cites its own statement of additional proposed facts in support of its claims that the defendant has admitted to discrimination. Dkt. No. 56 at 15. In support of its claim that the defendant has admitted that it rescinded the job offer because Wilson-Clayton tested positive for Alprazolam, the plaintiff cites five paragraphs from its additional proposed facts— paragraphs 50-55.

Paragraph 50 states, "When [the defendant] describes that Wilson-Clayton did not successfully complete its pre-employment process, it means that Wilson-Clayton failed the drug screen when she tested positive for

Alprazolam." Dkt. No. 58 at ¶50. The paragraph cites two exhibits—Dkt. No. 59-25 (Exhibit 25 to the declaration of plaintiff's counsel Richard Mrizek) and Dkt. No. 59-45 (Exhibit 45 to that same declaration). Dkt. No. 59-25 appears to be a memo from "Erica Lawrence Human Resources Partner" to "Robert Tomlinson" dated February 2, 2018, regarding EEOC charge number 443-2018-00741. Dkt. No. 59-25. In this memo, Lawrence explains that the same day "we" (presumably the defendant) were notified of a positive drug test, "Ms. Wilson Clayton stated that she would contact the Medical Review Officer (MRO) to supply documentation regarding the status of her positive drug screen. She did not supply this information to the MRO." Id. Lawrence goes on to say that on December 29, 2017, Isaacson contacted "Noble (MRO) for follow up, and no further documentation had been provided by Ms. Wilson-Clayton, and the drug screen remained positive." Id. Lawrence explains that the employment offer was not rescinded for a disability, but "for testing positive on the drug test and ultimately not successfully passing the pre-employment process. The offer was provided to Wilson-Clayton on the condition of successful background and pre-employment physical and drug test which she did not pass." Id.

Dkt. No. 59-45 is an excerpt of Ms. Lawrence's August 17, 2020 deposition testimony. The excerpt picks up at page 30, where the plaintiff's counsel is in the middle of trying to "clarify the statement here that 'The offer was rescinded for testing positive on the drug test' is accurate." Id. at 3, Tr. Page 30 lines 1-3. It appears the parties were discussing the memo at Dkt. No. 59-25. Lawrence answered that that was what the document said. Id. at line 8.

When asked whether the offer was rescinded because Wilson-Clayton tested positive on the drug test, Lawrence answered, "No." Id. at lines 14-15, 22. In clarifying, Lawrence stated, "It wasn't specifically that she tested positive. She didn't successfully pass the preemployment process, which part of that is testing and then providing documentation." Id. at 3, Tr. Page 32, lines 9-12. There followed attempts by counsel to unpack this statement, and to get Ms. Lawrence to agree that the reason Wilson-Clayton's offer was rescinded was because she tested positive. Eventually, Lawrence explained that she sent the memo to the EEOC because "a response was required," and that because she was "HR business partner," it was her job to respond. Id. at 4, Tr. Page 34, lines 9-12. Lawrence never had conversations with Dr. Kevin Edwards (the MRO). Id. at 5, Tr. Page 38. The only person employed by the defendant whom Lawrence consulted when preparing the document was Brian Kramer, vice president of human resources. Id.

Paragraph 51 of the plaintiff's additional proposed findings of fact states that "Erica Lawrence drafted a letter to EEOC on February 2, 2018 about Wilson-Clayton stating 'the offer was rescinded for testing positive on the drug test and ultimately not successfully passing the pre-employment process. The offer was provided to Wilson-Clayton on the condition of successful background and pre-employment physical and drug test which she did not pass." Dkt. No. 58 at ¶51. This paragraph again cites Lawrence's letter to the EEOC (Dkt. No. 59-25) and Lawrence's deposition; actually, it cites Dkt. No. 59-38, which is an Aurora Occupational Health Services drug and alcohol testing form, but it then

43

references Dkt. No. 59-45—the deposition transcript—at pages 45 line 18 through 36 line 9 (presumably the plaintiff meant to cite pages 35 line 18 through 36 line 9, because there is no page 45 in the exhibit).

Paragraph 52 of the plaintiff's additional proposed findings of fact cites four lines from Lawrence's deposition transcript. Dkt. No. 58 at ¶52. In these lines, the plaintiff's counsel asked Lawrence "what part of the preemployment process" Wilson-Clayton had not satisfied and Lawrence responded, "The drug screen." Id. Counsel states, "Because she tested positive on the drug screen, correct?" and Lawrence answers, "Correct." Id.

Paragraph 53 of the plaintiff's additional proposed findings of fact states, "[The defendant's] 30(b)(6) Witness, Brian Kramer, testified that Wilson-Clayton's offer was revoked because 'she did not clear the drug test.'" Dkt. No. 58 at ¶53. It cites Dkt. No. 59-3, an excerpt of the August 12, 2020 deposition of the defendant's vice president of human resources, Brian Kramer. The paragraph references six lines—page 67 of the transcript at lines 4-9. Id. Those lines include a question from the plaintiff's counsel: "What was the reason Ms. Wilson-Clayton's offer of employment was revoked by [the defendant]?" Dkt. No. 59-3 at 9, Tr. Page 67, lines 4-6. They contain the following three sentences of Kramer's answer: "The offer was revoked. She cleared the medical side of the occ health. She did not clear the drug test." Id., lines 7-9.

Paragraph 54 of the plaintiff's additional proposed findings of fact states, "Kramer testified that the company believes abused prescription drugs meant 'prescription drugs that somebody does not have a valid doctor's prescription

for.'" Dkt. No. 58 at ¶54. This paragraph cites three lines from Kramer's deposition, a portion of an answer without the preceding question: "Abused meaning prescription drugs that somebody does not have a valid medical doctor's prescription for which ultimately protects coworkers and the patients." Dkt. No. 59-3 at 4, Tr. Page 29, lines 5-8.

Finally, paragraph 5 of the plaintiff's additional proposed findings of fact states that the defendant "determined that it had to rescind Wilson-Clayton's offer after she tested positive for Alprazolam and did not contact the MRO due to the 'assumption that [Wilson-Clayton] did not have a valid prescription for the drug that she tested positive for." Dkt. No. 58 at ¶55. Again, the paragraph cites to a portion of Kramer's deposition. This excerpt starts in the middle of a sentence in the midst of a long answer from Kramer: ". . . in noncontact with the MRO, that Mandy Isaacson determined that we needed to rescind the offer due to the assumption that she did not contact the MRO after two attempts of reaching out to Ms. Wilson, that the assumption she did not have a valid prescription for the drug that she tested positive for." Dkt. No. 59-3 at 9, Tr. Page 67, lines 20-24; Tr. P. 68, lines 1-2.

The plaintiff relies on this carefully curated selection of snippets to assert in opposition to the defendant's motion for summary judgment that "[t]here is undisputed evidence that [the defendant] revoked Wilson-Clayton's offer because of her positive drug screen for Alprazolam." Dkt. No. 56 at 15. Similarly, in its own motion for summary judgment, the plaintiff claims that the defendant "based its adverse employment action on its erroneous belief

45

that Wilson-Clayton abused drugs," asserting that drug abuse is an ADA-recognized "impairment" and that the ADA protects individuals whom employers erroneously believe abuse drugs. Dkt. No. 48 at 10-11.

The plaintiff says that the bits and snippets quoted above are, in effect, a "smoking gun" admission from Lawrence and Kramer that the defendant rescinded the job offer because it thought (erroneously) that the plaintiff was abusing drugs. The plaintiff's "smoking gun" argument is a classic case of cherry-picking evidence. Even the small portion of Lawrence's deposition transcript that the plaintiff included shows that Lawrence had no personal knowledge of why Wilson-Clayton's offer was rescinded. She prepared the February 2018 letter to the EEOC with information she received from Brian Kramer, the defendant's vice president of HR. And Lawrence's letter did *not* say that the defendant had rescinded the offer because the defendant believed that Wilson-Clayton was a drug abuser. It explained that subsequent to the defendant learning of the positive drug test, Wilson-Clayton had indicated that she would contact the MRO to provide documentation, but that Wilson-Clayton never had done so. Dkt. No. 59-25. It stated that employees of the defendant confirmed several days later that Wilson-Clayton had not provided documentation. Id. The letter *did* state that the offer was rescinded for "failure to complete the pre-employment requirements (failed drug test)," but read in its entirety, the letter says that the issue was failing the drug test *combined with* failing to provide documentation that would have showed that Wilson-Clayton had a prescription.

46

The same is true of Lawrence's deposition; although Lawrence was not involved in the decision to rescind the offer, she stated that the decision to rescind was "not specifically that [Wilson-Clayton] tested positive. She didn't successfully pass the preemployment process, which part of that is testing *and then providing documentation.*" Dkt. No. 59-45 at 3, Tr. Page 32, lines 9-12 (emphasis added). While at other places the plaintiff's counsel frames questions in such a way that Lawrence answers that the part of the preemployment process Wilson-Clayton failed was the drug test, the entirety of her answers and the February 2018 letter demonstrate that it was both the failed drug test *and* the failure to provide documentation showing that Wilson-Clayton had a prescription for the drug for which she tested positive that led to the rescission of the offer.

The same is true of Kramer's testimony. The following is the full question and answer from which the plaintiff drew a tiny excerpt:

> **Q.:** Let's move to Topic No. 6, which is the reasons Ms. Wilson-Clayton's offer was revoked and all communications made by [the defendant] or any [of the defendant's] agents for the reason her offer was revoked.
> What was the reason Ms. Wilson-Clayton's offer of employment was revoked by [the defendant]?
>
> **A.:** The offer was revoked. She cleared the medical side of the occ health. She did not clear the drug test. From the discussion, as we've talked about in previous questions, through the MRO, and the offer was rescinded due to failing the process. We reached out to her twice, the MRO and Gina Whipple, and Gina Whipple, that's not something she normally does. She went above and beyond her job to make sure Ms. Wilson knew to call back the MRO, and that didn't take place. That was the third week of December. So then moving forward another eight or nine days to that 2nd day of January, the determination was made, after two and a half weeks in noncontact with the MRO, that Mandy Isaacson determined that we needed to

47

rescind the offer due to the assumption that she did not contact the MRO after two attempts of reaching out to Ms. Wilson, that the assumption she did not have a valid prescription for the drug that she tested positive for.

Dkt. No. 59-3 at 9, Tr. Page 66, line 24, Tr. Page 67, lines 7-24, Tr. Page 68, lines 1-2.

Plaintiff's counsel went on to ask what information Wilson-Clayton needed to provide to avoid having the offer rescinded; Kramer responded, "Medically—a prescription from a medical provider for that drug that she tested positive on." Id., Tr. Page 69, lines 2-6. When asked whether there was a timeframe for providing the prescription, Kramer responded:

She was supposed to call the MRO back. I don't know what the MRO shared with the message to Ms. Wilson as far as the time frame to call her back. I'm not aware of that. When Ms. Whipple, Gina Whipple, contacted Wilson, they talked for a few minutes, and Ms. Wilson said she would call the MRO the next day is my understanding, within roughly 24 hours. Those are my words. As soon as possible.

Id. at lines 12-20.

Later, Kramer testified:

She [Wilson-Clayton] did not contact the MRO. She did not return his phone call after Ms. Whipple called Ms. Wilson to remind her, or ask her to call the MRO, because he was trying to call her. She didn't call back even after the second attempt of reminding her to call the MRO. That was on approximately the 21st of December.

Id. at 10, Tr. Page 72, lines 15-21.

Kramer's answers go on like that for some time. At one point, counsel asked, "[s]o if [Wilson-Clayton] had provided, on January 3rd or January 4th, information showing she had a prescription, would the decision to rescind the

48

offer have been reversed?" Id. at 15, Tr. Page 106, lines 19-22. Kramer answered:

> We would have received, from the MRO, a cleared drug test, and we would have worked to get her in, most likely, the following new hire orientation which was two weeks later. Again, we don't know the reasons why or why not somebody is positive. We just know that they're cleared, and we take that and love to have them—get them onboard, and get them in that next new-hire orientation.

Id. at Tr. Page 106, lines 23-24; Tr. Page 107, lines 1-6.

The discussion about drug abuse happened during questioning about why the defendant had implemented a pre-employment drug screening policy. The plaintiff's counsel asked whether Kramer knew of any documents that explained why the defendant had instituted a pre-employment drug screening policy. Id. at 4, Tr. Page 28, lines 19-21. Kramer answered:

> No. Through my research, as I mentioned earlier, I've reviewed the archives. There was no drug test related documents except the Aurora document which goes back to 2003. The—I can assume, because it's best practice at most healthcare institutions. All of the ones that I've worked at, have a drug test policy to screen for illegal drugs and abused prescription drugs. Abused meaning prescription drugs that somebody does not have a valid medical doctor's prescription for which ultimately protects coworkers and the patients.

Id., Tr. Page 28, lines 22-24, Tr. Page 29, lines 1-8.

Having read the Lawrence letter, Lawrence's deposition testimony and Kramer's deposition testimony together, the court is taken aback by the plaintiff's contention that it need not rely on the McDonnell Douglas burden-shifting framework because the defendant has admitted that it withdrew Wilson-Clayborn's employment offer due to its belief that she was a drug abuser. The defendant has not admitted that it believed that Wilson-Clayton

49

was a drug abuser. It has not admitted that it rescinded the offer because it believed that Wilson-Clayton was a drug abuser. There is no "smoking gun." The defendant *has* stated, repeatedly and through various employees, that it rescinded the offer because after Wilson-Clayton's drug test came back positive, she did not provide proof that she had a prescription for the drug for which she tested positive. And, as the discussion in the next section will demonstrate, if Wilson-Clayton *had* been engaged in the illegal use of drugs at the time of the events described in the complaint, she would not have been protected by the ADA.

There is no genuine dispute of material fact regarding whether the defendant has admitted the first and third elements of a §12112(a) claim—it has not.

   b. The <u>McDonnell Douglas</u> burden-shifting framework

The court could stop the analysis at this point, grant the defendant's motion for summary judgment and deny the plaintiff's motion. The plaintiff has the right to frame the case as it sees fit; courts must "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." <u>United States v. Sineneng-Smith</u>, 140 S. Ct. 1575, 1579 (2020) (quoting <u>Greenlaw v. United States</u>, 554 U.S. 237, 244 (2008)). "[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitled them to relief.'" <u>Id.</u> (quoting <u>Castro v. United States</u>, 540 U.S. 375, 386 (2003)). The plaintiff has a

50

right to rely only on its insistence that the evidence shows that defendant has admitted that it discriminated against the plaintiff, and not to rely on the McDonnel-Douglas burden-shifting framework.

But the plaintiff brought this suit on behalf of Wilson-Clayton. Because this is not a traditional circumstance involving a plaintiff who is represented by counsel of her choosing, caution dictates that the court also consider the plaintiff's §12112(a) claim under the McDonnell Douglas framework. Under this framework, the court first must determine whether the plaintiff has demonstrated that Wilson-Clayton "belongs to a class of people protected by" the ADA. Brooks, 39 F.4th at 433. To make that showing, the plaintiff must satisfy the four §12112(a) elements: it must show that Wilson-Clayton was disabled, that she was otherwise qualified to perform the job, that she suffered an adverse employment action and that that action was caused by her disability. Id. (citing Kurtzhals, 969 F.3d at 728). As the court has noted, the parties do not dispute that Wilson-Clayton was otherwise qualified or that she suffered an adverse employment action. To prove that Wilson-Clayton belonged to a class of people protected by the ADA, the plaintiff must demonstrate that she was disabled and that the job offer was rescinded because of that disability.

The McDonnell Douglas burden-shifting framework allows the plaintiff to make a *prima facie* case of discrimination by showing that Wilson-Clayton is disabled under the ADA, that she performed her job to her employer's legitimate expectations, that she suffered the adverse employment action and

51

that "one or more similarly situated individuals outside her protected class received better treatment." Id. at 434 (citations omitted). If the plaintiff can make that *prima facie* showing, the burden shifts to the defendant to produce evidence that it rescinded the job offer for "legitimate, nondiscriminatory reasons." Id. If the defendant successfully makes that showing, the burden shifts back to the plaintiff to show that the defendant's purported legitimate, nondiscriminatory reason was a pretext—"an attempt to mask a discriminatory reason with a legitimate excuse." Id.

i.     Disability under the ADA

The ADA defines a disability as: "'(1) [a] physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) [a] record of such an impairment; or (3) [b]eing regarded as having such an impairment.'" Kurowski v. Shinseki, 557 F. App'x 549, 553 (7th Cir. 2014) (quoting Steffen v. Donahoe, 680 F.3d 738, 743 (7th Cir. 2012)); 42 U.S.C. §12112(a).

The complaint the plaintiff filed on Wilson-Clayton's behalf did not identify a disability. It alleged only that the defendant had discriminated against Wilson-Clayton "when it rescinded her job offer based on her use of a legally prescribed medication," and that the rescission was based on "actual or perceived impairments for which she was taking the medication." Dkt. No. 1 at ¶¶26-27. The EEOC charge Wilson-Clayton filed does not describe or identify a disability; it states only that Wilson-Clayton had a medical history and

physical, that the job offer was rescinded and that she believed that the defendant had discriminated against her based on a disability. Dkt. No. 40-8.

The first time the plaintiff described what it believed Wilson-Clayton's disability to be was in its brief in support of its motion for summary judgment, Dkt. No. 48. The plaintiff stated that the defendant had discriminated against Wilson-Clayton "when it regarded her as disabled, erroneously believing she abused drugs . . . ." Id. at 4. It asserted that there was "no genuine dispute that [the defendant] revoked Wilson-Clayton's conditional offer because [it] wrongly perceived her to be a person with a drug abuse impairment," and that "Wilson-Clayton is disabled under the ADA because [the defendant] erroneously regarded her as having the impairment of drug abuse and rescinded her offer on that basis." Id. at 10. This allegation of the plaintiff's disability (there is more than one) falls under the "being regarded as having such an impairment" prong of the ADA's definition of a disability.

Under §12114(a), "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." The "illegal use of drugs" is defined as "the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act." 42 U.S.C. §12111(6)(A); 29 C.F.R. §1630.3(a)(2). But drug use is not considered illegal if the drug is taken "under the supervision of a licensed health care professional." Id.

53

Oddly, the plaintiff first argues in its opposition to the defendant's summary judgment motion that drug abuse constitutes "an impairment under the ADA." Dkt. No. 48 at 11. The plaintiff cites several cases in support of this proposition, none of which are from the Seventh Circuit. The Supreme Court case the plaintiff cites, Bragdon v. Abbott, 524 U.S. 624, 632-3 (1998), quotes from commentary to the Department of Health, Education and Welfare's early regulations interpreting the Rehabilitation Act of 1973 when indicating that drug addiction may constitute a "physical or mental impairment" under those regulations. Two of the other cases the plaintiff cites do not address §12114(a) at all (although it excludes from the definition of a qualified person with a disability someone currently engaged in the illegal use of drugs), while the third acknowledges §12114(a) and makes the distinction (as does the statute) between people *currently* using illegal drugs (who are not protected individuals under the ADA) and those with a *record* of having used but who are not currently using (who can be protected). See Thompson v. Davis, 295 F.3d 890, 896 (9th Cir. 2002).

Those cases aside, it is not clear why the plaintiff makes this argument. The issue in this case is not whether the defendant discriminated against Wilson-Clayton based on a belief that she may have illegally used drugs in the past but was not currently illegally using them. Because Wilson-Clayton submitted the urine sample that tested positive in connection with her pre-employment process, the clear implication to the defendant was that she was *currently* using the drug. If she had been currently using the drug without a

54

valid prescription, she would have been "currently" engaging in the illegal use of drugs and would not have been a qualified individual under the ADA, per §12114(a).

Next, the plaintiff asserts that the ADA protects people who are erroneously regarded by employers as being abusers of illegal drugs. Dkt. No. 48 at 11. Section 12114(b)(3) clarifies that the section does not exclude as a qualified individual with a disability someone who "is erroneously regarded" as engaging in the illegal use of drugs, but not actually engaging in such use. But there is no evidence in the record that the defendant regarded Wilson-Clayton as a drug addict or a drug abuser. The plaintiff emphasizes that when asked about why the defendant implemented a pre-employment drug screening policy, Kramer responded that all the healthcare institutions for which he'd worked had a testing policy to screen for abused prescription drugs, which he defined as "prescription drugs that somebody does not have a valid medical doctor's prescription for . . . ." Dkt. No. 59-3 at 4. The fact that Kramer may have defined the "abuse" of prescription drugs as using prescription drugs without a valid prescription does not mean that the defendant assumed that Wilson-Clayton was a drug abuser (or even that Kramer did).

The evidence shows that on one occasion, Wilson-Clayton tested positive for Alprazolam. On December 19, 2017, the defendant became aware of the fact that Wilson-Clayton had tested positive. One of its employees contacted Wilson-Clayton on December 21, 2017 to tell her that the MRO was trying to reach her; the employee came away from that call feeling assured that Wilson-

55

Clayton would contact the MRO within a day of the call. The defendant did not rescind the job offer until two weeks later, on January 2, 2018. By that time, Wilson-Clayton had had twelve days to contact the MRO. Because she had not done so, the defendant assumed that the reason Wilson-Clayton had not produced proof of a prescription was because she didn't have any.

At summary judgment, the "moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." Lewis v. Ind. Wesleyan Univ., 36 F.4th 755, 759 (7th Cir. 2022) (quoting Tyburski v. City of Chi., 964 F.3d 590, 597 (7th Cir. 2020)). The defendant has presented evidence showing that it had no way of knowing that Wilson-Clayton had a prescription for the drug for which she had tested positive and thus was not using it illegally. It is undisputed that Wilson-Clayton tested positive for benzodiazepines, specifically Alprazolam. Dkt. No. 57 at ¶46. Although Wilson-Clayton indicated on page three of the four-page Aurora form that she was taking Alprazolam, dkt. no. 65 at ¶33, dkt. no. 59-7 at 3, it is undisputed that only Page 1 of the form, which did *not* include that information, was sent to the defendant, dkt. no. 57 at ¶40. It also is undisputed that the defendant's employees were not notified of Wilson-Clayton's medical history. Id. at ¶43.

The plaintiff argues that knowledge of the prescription should be imputed to the defendant because Wilson-Clayton wrote as much on Aurora's form and Aurora was performing post-offer, pre-employment medical exams on

56

behalf of the defendant.[6] But there is no evidence that Aurora informed the defendant of what Wilson-Clayton wrote on Page 3 of the form. In fact, the reason that Aurora sent only Page 1 of the form to the defendant was to protect patient confidentiality. Even if Aurora had sent Page 3 of the form to the defendant, the form does not ask the applicant to indicate which listed medications the applicant has prescriptions for. And even if Wilson-Clayton had indicated on the form that she had a prescription for Alprazolam, the fact that a person says that she has been prescribed medication is not proof that the person has a prescription. The defendant has asserted that an employment candidate who tests positive for one of the legal drugs tested for by the 10-panel drug screen must verify with the MRO that he or she has a valid prescription, dkt. no. 57 at ¶23, whether by the candidate presenting the prescription to the MRO or giving the MRO her doctor's or pharmacy's information so that the MRO could verify the information.[7] There is no dispute that Wilson-Clayton did not present that proof.

---

[6] The case the plaintiff cites for the proposition that employers cannot contract their ADA obligations to third parties, Holiday, 206 F.3d 637, involved the city's reliance on a third-party doctor's determination that the plaintiff was unfit for the job due to his HIV-positive status, when neither the doctor nor the city evaluated whether that status would have impeded the applicant's ability to perform the job. While the court does not disagree that an employer cannot participate in contractual arrangements that subject applicants or employees to discrimination, that did not happen here.

[7] The plaintiff spills significant ink arguing that there was no federal or state law that required the defendant to test for drugs. The defendant never said that drug testing was a governmentally imposed hiring requirement.

The plaintiff argues that Wilson-Clayton did not know that she had tested positive for Alprazolam and did not know that she needed to provide proof that she had a prescription. Given the way things unfolded, this may be true. On December 19, 2017, Noble Diagnostics, through subcontractor i3Screen, called the number Wilson-Clayton had provided and left a voicemail, although the content of the voicemail is disputed. Id. at ¶¶51, 54; Dkt. No. 65 at ¶37. Wilson-Clayton testified that she did not recall such a voicemail. Perhaps she wasn't the person who listened to the voicemail—it is undisputed that other people in Wilson-Clayton's household also used that telephone number. Perhaps she did listen to the voicemail and did not realize its significance.

More problematic to the plaintiff's argument is the fact that after the defendant became aware that Wilson-Clayton had tested positive for a prescription medication, Whipple (an employee of the defendant) called Wilson-Clayton to tell her that the MRO was trying to reach her, providing her with his direct number. Dkt. No. 57 at ¶59. The plaintiff testified that she did not receive any phone calls between the date the defendant made the conditional offer and the date she learned it had been rescinded, but Whipple's phone records verify that Whipple had an almost three-minute phone call with Wilson-Clayton on December 21, 2017, dkt. no. 57 at ¶66 (citing dkt. no. 40-12 at 36), and there is an email from Whipple to Isaacson the same day, recounting the content of the call and indicating that Wilson-Clayton had been adamant that she was going to contact the MRO the following day, id. at ¶63

58

(citing Dkt. No. 40-12 at 3). Even if Whipple did not say to Wilson-Clayton, "You need to call Dr. Edwards because you tested positive for a prescription drug and you need to verify for him that you have a prescription for it," the defendant had put Wilson-Clayton on notice that something was lacking in the pre-employment process that she needed to address. The defendant waited another twelve days—until January 2, 2018—before notifying Wilson-Clayton that the offer was being rescinded. Although a few of those twelve days were holidays during which the MRO's office might have been closed, there were other days on which Wilson-Clayton could have made contact with Edwards.

The defendant has presented evidence showing that, to the defendant, Wilson-Clayton's actions—or inaction—gave the appearance that she had tested positive for Alprazolam and would not or could not provide proof of a valid prescription. Arguably, Wilson-Clayton was not "erroneously regarded" as engaging in the illegal use of drugs, because she tested positive for a prescription drug but did not provide proof that she had a prescription, despite being contacted by an employee of the defendant and advised that the MRO had been trying to reach her.[8] And the record contains no evidence that the

---

[8]In its primary brief in support of its motion for summary judgment, the defendant assumed that Wilson-Clayton's disability was her anxiety, and argued that under a "regarded as"—or "perceived"—disability claim, the plaintiff was required to show that the employer regarded the perceived impairment as one that limited a major life activity. Dkt. No. 39 at 17. That is not the case. A plaintiff "meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §12102(3)(A). As the Seventh Circuit explained in <u>Richardson v. Chi. Transit Auth.</u>, Congress

59

defendant regarded Wilson-Clayton as being an addict or a drug abuser. It regarded her as someone who had tested positive for Alprazolam and who had not verified that she had a prescription for that drug.

In its brief in opposition to the defendant's motion for summary judgment, the plaintiff suggested another possible disability—anxiety, or the perception of anxiety. Dkt. No. 56 at 2. The plaintiff argued that a jury could find that the defendant discriminated against Wilson-Clayton "because it perceived her as . . a person with anxiety . . . ." Id. The plaintiff argued that Wilson-Clayton met the definition of being disabled "under the ADA both because [the defendant] regarded her as having a drug abuse impairment or having anxiety, and she is actually disabled as someone who has been medically diagnosed and treated for anxiety." Id. at 7. The plaintiff asserted that there was sufficient evidence to allow a jury to find that the defendant knew that Wilson-Clayton had anxiety, because Amanda Isaacson—the person who was notified that Wilson-Clayton had tested positive for Alprazolam—is a registered nurse and "is familiar with why Alprazolam is prescribed." Id. at 12. The plaintiff insists that the defendant would have known that Alprazolam is commonly prescribed for anxiety. Id. The plaintiff also argues that Wilson-

amended the ADA in 2008 "to make clear an individual can be 'regarded as' having an impairment 'whether or not the impairment limits or is perceived to limit a major life activity.'" 926 F.3d 881, 888 (7th Cir. 2019) (quoting 42 U.S.C. §12102(3)(A)); see 29 C.F.R. §§1630.2(j)(2), (l)(1). The court notes this only to clarify that if the evidence had demonstrated that the defendant had "erroneously regarded" Wilson-Clayton as currently engaging in the unlawful use of drugs, the plaintiff would not have been required to prove that the defendant perceived that unlawful drug use to limit or impair one of Wilson-Clayton's major life activities.

Clayton is disabled because she has anxiety which, if left untreated, would "substantially limit a number of major life activities, and in fact did substantially limit her ability to sleep." Id. at 13.

There is even less evidence in the record to support this claim than the plaintiff's claim that the defendant erroneously regarded Wilson-Clayton as being a drug abuser. Isaacson testified at her August 17, 2020 deposition that she was a registered nurse and that she was familiar with Alprazolam. Dkt. No. 59-5 at 5, Tr. Page 56, lines 2-7. When asked if she knew what Alprazolam was prescribed for, she responded, "There's a number of things it's prescribed for." Id. at lines 11-14. There was no mention of anxiety as being one of the "things" Isaacson referenced. The defendant stated in its proposed findings of fact that benzodiazepines "are commonly prescribed for anxiety, insomnia, alcohol withdrawal, seizure control, and muscle relaxation . . . ." Dkt. No. 57 at ¶49. The plaintiff disputed this proposed finding on the basis that it misstated "the uses for Alprazolam"—something the finding did not purport to do, id., but then cited that proposed finding of fact for the proposition that the defendant "admits that Benzodiazepines like Alprazolam are commonly prescribed for anxiety," dkt. no. 12 at 10. The plaintiff also argued that the defendant's failure to answer Wilson-Clayton's questions about why it had rescinded the job offer "creates a triable issue about whether it regarded her as disabled because it regarded her as impaired by drug abuse or impaired by anxiety." Dkt. No. 56 at 10-11.

61

There is no record evidence indicating that the defendant regarded Wilson-Clayton as suffering from anxiety. She did not disclose that fact on the Aurora medical form. There is no evidence that Alprazolam's only use is for treatment of anxiety. There is no evidence that the defendant did not respond to Wilson-Clayton's questions about why the job offer was rescinded because it regarded her as suffering from anxiety. There is no evidence that would allow a reasonable factfinder to conclude that the defendant regarded Wilson-Clayton as suffering from anxiety.

Nor is there evidence that Wilson-Clayton's anxiety rendered her disabled. She testified at her deposition that she took Alprazolam for her "panic attacks" and that she suffered from anxiety. Dkt. No. 59-1 at 44, line 4. She said nothing about the anxiety or the panic attacks interfering with or limiting a major life activity. Dr. Asghar testified at her September 29, 2020 deposition that while Wilson-Clayton had longstanding sleep issues and had seen a sleep specialist, she could not recall the status of Wilson-Clayton's sleep issues in December 2017. Dkt. No. 59-2 at 6, Tr. Page 23, lines 12-24; Tr. Page 24, lines 1-6. She could not testify about whether Wilson-Clayton was having anxiety issues in December 2017. Id. at 7, Tr. Page 31, lines 2-6. She testified that Wilson-Clayton took Alprazolam for anxiety as of the end of November 2017. Id. at Tr. Page 23, lines 21-24; Tr. Page 33, line 1. And she testified that she had "no idea" whether Wilson-Clayton "could perform the job of intake specialist with or without Alprazolam." Id. at 8, Tr. Page 34, lines 4-8. Asghar did not diagnose Wilson-Clayton's anxiety, id. at 10, Tr. P. 42, lines 17-18, and while

62

she could describe the symptoms of anxiety, id. Tr. Page 43, lines 6-22, she was not able to opine on Wilson-Clayton's state in December 2017, id. at Tr. Page 44, lines 8-11. A progress note showing that during an October 5, 2017 appointment, a health psychology doctoral student named Adiona Mustafaraj listed "Insomnia" next to the word "Diagnosis" contains no mention of anxiety. Dkt. No. 60-1 at 2. The parties agree that during the relevant period, Wilson-Clayton was not substantially limited in her ability to work, care for herself, perform manual tasks, stand, lift, learn, concentrate or communicate. Dkt. No. 64 at ¶¶89-93.

There is nothing in the record to support the plaintiff's claim that without the Alprazolam, Wilson-Clayton's activities would have limited a major life activity. The record contains no evidence of how Wilson-Clayton's anxiety impacted her prior to being prescribed Alprazolam. There simply is no record evidence that the anxiety constituted a disability as defined by the ADA.

Finally, if the defendant did not know that Wilson-Clayton suffered from anxiety, it could not discriminate against her based on that anxiety. Even if there was evidence in the record that Wilson-Clayton's anxiety constituted a "disability" because it substantially limited one or more of her major life activities, the record contains no evidence that the defendant knew Wilson-Clayton suffered from anxiety.

The plaintiff cannot establish the first element of the burden-shifting framework's *prima facie* case—that Wilson-Clayton was disabled.

### ii. Meeting Employer's Legitimate Expectations

The second element requires the plaintiff to establish that she performed her job to her employer's legitimate expectations. Wilson-Clayton never got the job. But the defendant argues that by failing to complete the pre-employment screening process, Wilson-Clayton did not meet the defendant's legitimate expectations. Dkt. No. 39 at 19. Arguably, "clearing" the drug screen—providing verification of a prescription in the event of a positive test for a prescription drug—was a "legitimate" expectation of a job candidate, one that Wilson-Clayton did not meet. The court has discussed the plaintiff's argument that Wilson-Clayton did not know that she'd tested positive and needed to verify a prescription; the evidence in the record demonstrates that Whipple called Wilson-Clayton to tell her that the MRO was trying to reach her, but that Wilson-Clayton did not contact the MRO or provide verification of her prescription.

### iii. Similarly Situated Applicants

Finally, the defendant argues that the plaintiff cannot show that one or more similarly situated applicants were treated more favorably than she. Dkt. No. 39 at 20. Under the McDonnell Douglas burden-shifting framework, it is the *plaintiff's* burden to make the *prima facie* case. "At summary judgment, '[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor.'" Igasaki v. Ill. Dep't of Fin. and Prof'l Regulation, 988 F.3d 948, 957-58 (7th Cir. 2021) (quoting Vega v. Chi. Park Dist., 954 F.3d 996, 1004 (7th Cir. 2020)).

The plaintiff chose not to utilize the <u>McDonnell Douglas</u> burden-shifting framework. Consequently, it presented *no* evidence of any similarly situated applicants. Instead, in its brief in opposition to the defendant's motion for summary judgment, it argued that "[o]ther employees scheduled to begin their employment on January 8, 2018 were given more time to complete the process and did not have their offers rescinded on December 29, 2017." Dkt. No. 56 at 19. The plaintiff does not identify these employees or explain how they were similarly situated to Wilson-Clayton. The plaintiff also argued that the day before the defendant decided to rescind Wilson-Clayton's offer, Hildreth sent Isaacson an email about a candidate for whom the defendant needed the MMR titer and had no confirmation that she'd gone for testing. <u>Id.</u> at 19-20 (citing the plaintiff's additional proposed findings of fact, which cited Dkt. No. 59-35). The plaintiff argued that the defendant had decided to give that candidate another week to comply. <u>Id.</u> But the plaintiff fails to explain how this candidate was similarly situated to Wilson-Clayton—when did this candidate have her medical exam? Had she been contacted previously about the missing information? How long ago had she been contacted? The plaintiff did not provide sufficient information to show that this was a *similarly situated* candidate to Wilson-Clayton.

The defendant provided statistics regarding the number of individuals whom it indicated tested positive on a drug screen but were able to clear the drug screen by satisfying the Medical Review Officer and who were hired. Dkt. No. 57 at ¶¶83-88. It asserted that between January 2017 and January 2018,

Wilson-Clayton was the only person who tested positive for a prescription drug who was not cleared by the Medical Review Officer. Id. at ¶88. The plaintiff objected to these proposed findings of fact as lacking foundation. But under the burden-shifting framework, it was not the *defendant's* burden to establish that there were one or more similarly situated individuals who were treated more favorably than Wilson-Clayton. That was the plaintiff's burden. It has not met that burden.

### c. Conclusion

The plaintiff has not identified any "smoking gun" evidence from which a reasonable factfinder could conclude that the defendant admitted to having discriminated against Wilson-Clayton based on a disability. The plaintiff has not established a *prima facie* case of discrimination under the burden-shifting framework; in fact, the plaintiff specifically chose not to do so. The parties dispute many facts, but even when the court views the facts in the light most favorable to the plaintiff (in resolving the defendant's motion), the disputes do not create genuine issues of material fact that, if resolved in the plaintiff's favor, would allow a reasonable jury to find for the plaintiff on the §12112(a) claim.

### 2. *Medical Examination Claim*

The plaintiff's second argument is that the court must grant summary judgment in its favor because the defendant's pre-employment screening process violates 42 U.S.C. §12112(d)(2). Dkt. No. 48 at 15.

Section (d) of §12112 is titled "Medical Examinations and Inquiries." Subsection (d)(1) says that the ADA's prohibition against discrimination applies to medical examinations and inquiries. Section 12112(d)(2) covers "pre-employment," prohibiting covered entities from conducting medical exams or making inquiries "as to whether [an applicant] is an individual with a disability or as to the nature or severity of such disability." But it allows a covered entity to "make preemployment inquiries into the ability of an applicant to perform job-related functions." Subsection (d)(3) covers "employment entrance examinations," which the statute defines as a medical examination "after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant." The subsection says that the entity may "condition an offer of employment on the results of such examination if" all entering employees are subjected to such an examination regardless of disability, the information obtained regarding the applicant's medical condition or history is maintained on separate forms in separate files and treated as confidential except for certain described circumstances and the results of the exam are used only in accordance with "this subchapter."

In its brief in support of its motion for summary judgment, the plaintiff asserts that the drug screen that the defendant required Wilson-Clayton to take was a "medical exam" as defined by the statue. Dkt. No. 48 at 16. While it acknowledges that §12114(d)(1) explicitly says that "a test to determine the illegal use of drugs shall not be considered a medical examination," the plaintiff

67

insists that that exception does not apply here because the defendant's drug screen also tested for drugs taken under the supervision of a licensed health care professional (in other words, drugs that do not meet §12111(6)(A)'s definition of "illegal drugs"). Id. at 15. It asserts that the defendant had a choice of what to test for and chose a test that tested for both "illegal" drugs as that term is defined by the statute and legal prescription medications. Id. at 16. The plaintiff concludes that the drug screen was a "pre-employment" examination under §12112(d)(2), rather than a post-conditional job offer exam under §12112(d)(3), "because Wilson-Clayton was subject to multiple conditions that had to be met before she could secure a position with [the defendant]." Id. at 18. And, the plaintiff argues, under §12112(d)(2), a pre-employment exam is permissible only if it relates to the applicant's ability to perform the job functions; the plaintiff argues the defendant can't demonstrate this. Id. at 19. The plaintiff asserts that the defendant had "no job-related reason for testing for the prescription drug Alprazolam and no evidence that the use of this drug has any relationship to the intake specialist job . . . ." Id. at 20. Finally, the plaintiff argues that even if the court considers the drug screen a post-conditional job offer exam governed by §12112(b)(3), the defendant violated the statute "because it used the results of its medical exam without establishing business necessity or job relatedness for such use." Id. at 21.

The Seventh Circuit has stated, in recounting an Eleventh Circuit ruling, that a drug test "did not constitute a medical examination or inquiry since, under the ADA, drug tests are not considered medical examinations." E.E.O.C.

v. Thrivent Fin. for Lutherans, 700 F.3d 1044, 1051 (7th Cir. 2012) (discussing Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206 (11th Cir. 2010)). (The court cited 42 U.S.C. §12112(b) for this proposition; that appears to be a mis-citation, because §12112(b) prescribes the rules of construction for §12112(a)). Section 12114(d)(1), as the plaintiff acknowledges, says that for the purposes of the subchapter, "a test to determine the illegal use of drugs shall not be considered a medical examination."

The plaintiff asserts, however, that the drug test the defendant used falls outside the ambit of §12114(d) because it tests for drugs taken under the supervision of a medical professional. The plaintiff cites Connolly v. First Personal Bank, 623 F. Supp. 2d 928, 931 (N.D. Ill. 2008) in support of this argument. Dkt. No. 48 at 15. In Connolly, the plaintiff received a job offer contingent on her satisfactory completion of a pre-employment drug test. Connolly, 623 F. Supp.2d at 929. The plaintiff disclosed to the employer that she had recently received medical treatment that might result in medication showing up in her system. The drug test was positive for Phenobarbital; when the employer learned of the result, it rescinded the offer and refused to allow the plaintiff to explain that the Phenobarbital had been prescribed by her doctor. Id.

The plaintiff sued for a violation of the ADA and the employer filed a motion to dismiss. Id. The employer argued that §12114(d) stated that the drug screen was not a medical examination and thus that the court should dismiss the plaintiff's claim that the employer's drug screening process violated

69

§12112(d)(3)(C). Id. at 930. The plaintiff responded that "the drug test she was administered was a test for the use of legal drugs in addition to illegal ones and therefore was not the type of test exempt from the rules regarding medical examinations." Id. at 931. She asserted that because the employer used the result to rescind her offer, the employer "was required to show that its exclusionary criteria were job-related and consistent with business necessity." Id. The plaintiff argued that "the preemployment drug test, as administered to her, served as a blanket exclusionary test which left no allowance for the legal use of controlled substances." Id.

The district court denied the motion to dismiss. It stated:

> For purposes of the ADA, tests to determine illicit drug use are clearly not medical examinations. However, a test for illicit drug use may also, as in this case, return results for legal drug use that could affect the functioning of the employee in the specific job setting. A sensible reading of the statute instructs that an employer may only rely on a test for illicit drug use to make a employment decisions based on that illicit drug use. A problem arises when, as here, licit drug use appears on the applicant's drug test and the employer takes some action based on those results. Congress has a long history of enforcement against illicit drug use in this country, but I can't conclude that Congress intended to permit that enforcement mechanism to function in a way that circumvents the purpose of the ADA to prohibit discrimination against qualified individuals with disabilities. In these circumstances there is a minimal cost to determine whether the presence of Phenobarbital was legal. The exemption for drug testing was not meant to provide a free peek into a prospective employee's medical history and the right to make employment decisions based on the unguided interpretation of that history alone.

Id. The court concluded that the plaintiff "ha[d] sufficiently alleged that [the employer's] drug test was more than a mere test for illicit drug use and that [the employer] used the drug test in order to prohibit the use of even legally

70

prescribed medication without regard to whether such medication would impair [the plaintiff's] ability to effectively perform her job." Id. at 932.

The plaintiff also cites Bates v. Dura Auto. Sys., Inc., 767 F.3d 566 (6th Cir. 2014). Dkt. No. 48 at 15. That court stated that a test that screened for "prescribed medications exceeded [the] parameters" of §12114(d)(1). Bates, 767 F.3d at 574. And the plaintiff cites E.E.O.C. v. Grane Healthcare Co., 2 F. Supp. 667 (W.D. Pa. 2014). Dkt. No. 48 at 15. The plaintiff in Grane—who is the plaintiff here—argued that the legislative history of the ADA "suggests that the language permitting the use of a pre-offer 'test to determine the illegal use of drugs' was not intended to allow a covered entity to utilize a test that detects the use of both legal and illegal drugs," and asserted that the drug tests at issue in that case were medical examinations. Grane, 2 F. Supp. 3d at 703. Based on the facts in the case—that the urine samples were tested for both "medical and drug-use purposes" for "elements" such as "glucose" and "blood"—the court concluded that the tests "were obviously designed to elicit medical information extending far beyond evidence of illegal drug use," and found that test the fell outside the ambit of §12114(b). Id.

None of these decisions are binding on this court and the Seventh Circuit has not opined on the issue. But the court's conclusions regarding the plaintiff's §12112(a) claim dictate that this claim also fails. The cases plaintiff has cited make the drug screen/medical exam distinction based on the evidence before each court relating to the purpose behind the exam. The Connolly court made its ruling at the motion to dismiss stage, admitting that it

71

had only the plaintiff's allegation that her offer had been rescinded as a result of the positive drug test. The <u>Grane</u> court made its decision based on testimony proving that the drug tests tested for more than illegal drug use. In another decision involving <u>Grane</u>, the court held a trial and concluded that Grane had presented sufficient evidence to demonstrate that Grane's "only intent in performing pre-offer drug tests was to determine whether or not applicants were using illicit drugs." <u>E.E.O.C. v. Grane Healthcare Co.</u>, No. 3:10-250, 2015 WL 5439052, at *39 (W.D. Pa. Sept. 15, 2015).

Here, despite the volume of evidence the parties have presented, the court has no evidence that the defendant was testing for anything other than the "illegal use of drugs." The defendant requires all candidates to pass a post-offer drug test. Dkt. No. 57 at ¶4. The plaintiff asserts that the *law* does not mandate that the defendant require candidates to pass a drug test, <u>id.</u>, but that is not relevant to determining whether the defendant decided to require candidates to take a drug test for the unlawful purpose of ferreting out disabilities. The defendant does not know if a candidate has medical conditions that are disabilities unless the candidate requests an accommodation, <u>id.</u> at ¶14; the plaintiff's insistence that any information that Aurora gathers is provided to the defendant has no support in the record, and the events that happened here—where Aurora sent only Page 1 of the medical form to the defendant—belie the plaintiff's argument. If a candidate tests positive for a legal drug and the candidate provides the MRO with proof of a prescription, the MRO "changes the positive result to a negative result and forwards the negative

72

result" to the defendant—a fact the plaintiff does not dispute. Id. at ¶24. Although the plaintiff objects to it based on alleged lack of foundation, the defendant presented evidence that over fifty other candidates who'd tested positive on a drug screen were able to "clear" those screens and were hired. Id. at ¶85.

Assuming without deciding that the post-offer, pre-employment drug screen the defendant used was a "preemployment" "medical examination" under §12112(d)(2),[9] there is no record evidence to show that the defendant conducted it to determine whether Wilson-Clayton—or any other candidate— was an individual with a disability, or to determine the nature or extent of a disability.

_____

[9] Given the chronology in this case, one would think that if the drug screen *did* constitute a "medical examination," it would constitute an "employment entrance examination" under §12112(d)(3), which allows a covered employer to require a medical exam "after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant." That's the sequence of events that happened in this case, and in that instance, an employer *may* condition employment on the result of such an exam if all employees are subject to one, the information from it is kept confidential and the exam results are used only in accordance with the statute. But the Seventh Circuit stated in O'Neal v. City of New Albany, 293 F.3d 998, 1008-09 (7th Cir. 2002), that if the offer of employment "is conditioned not only on the job applicant successfully passing a medical examination but also a myriad of non-medical screening tests," the job offer is not "real." The defendant advised Wilson-Clayton that its offer was "contingent upon satisfactory references, background check and successfully passing all portions of the post-employment physical and drug screen." Dkt. No. 50-26. This court need not determine whether that offer was "real" for purposes of the §12112(b)(2) vs. §12112(b)(3) distinction, because it has determined that there is no evidence that the defendant was using the test for anything other than detecting the illegal use of drugs.

### 3. *Missed Opportunities*

The parties agree that if Wilson-Clayton had provided verification of her Alprazolam prescription by January 4, 2018 or so, the defendant "would have worked to have her start at the orientation following the orientation for which she was scheduled on January 8, 2018." Id. at ¶96. It is a head-scratcher that despite several people involved in the process—whether employees of the defendant or employees of third-party contractors—knowing that Wilson-Clayton was enquiring why the offer had been rescinded, no one responded to her. But unlike the facts in Connolly, this is not a situation in which Wilson-Clayton tried to provide proof of a valid prescription and was not allowed to do so. Unlike the plaintiff in Connolly, there were two contacts with the plaintiff after the positive drug test—the December 19, 2017 voicemail message from i3Screen employee Isioma Manu and the December 21, 2017 phone call with Gina Whipple. Wilson-Clayton says she does not remember either call, but the evidence proves that the calls occurred. The record evidence shows that there were two opportunities for Wilson-Clayton to find out why the MRO was trying to speak with her, opportunities that she did not take. The fact that she did not take those opportunities does not equate to discrimination by the defendant.

## VI. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 38.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 47.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 6th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**